ACCEPTED
04-15-00069-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
4/16/2015 9:12:23 AM
KEITH HOTTLE
CLERK

## NO. 04–15-00069-CV

# In the Fourth Court of Appeals
# San Antonio, Texas

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
04/16/2015 9:12:23 AM
KEITH E. HOTTLE
Clerk

Texas Municipal League Joint Self-Insurance Fund *a/k/a*
The Texas Municipal League Intergovernmental Risk Pool
*Appellant*
vs.

Housing Authority of the City of Alice, Texas
*Appellee*

Appeal from the 79th Judicial District Court
Jim Wells County, Texas, No. 14-10-53721-CV
The Honorable David Sanchez, Presiding Judge

## APPENDIX TO APPELLANT'S BRIEF

Barry Abrams
State Bar No. 00822700
Jack W. Higdon
State Bar No. 24007360
BLANK ROME LLP
700 Louisiana, Suite 4000
Houston, TX 77002-2727
(713) 228-6601
(713) 228-6605 (Fax)

ATTORNEYS FOR APPELLANT
TEXAS MUNICIPAL LEAGUE JOINT
SELF-INSURANCE FUND *A/K/A* THE TEXAS
MUNICIPAL LEAGUE INTERGOVERNMENTAL
RISK POOL

## ORAL ARGUMENT REQUESTED

Tab A      Interlocal Agreement    (CR 71-76)

Tab B      Property Coverage Document     (CR 78-125)

Tab C      Order Selecting Umpire    (CR 284)

Tab D      The Local Government Contract Claims Act (the "Act") (TEX. LOC. GOV'T CODE §§271.151, *et seq.*) excerpts

     – Act §271.152

     – Act §271.153

     – Act §271.154

Tab E      TEX. GOV'T CODE excerpts

     – Act §791.001

     – Act §791.011(a)

     – Act §311.034

Respectfully submitted,

By: /s/ Barry Abrams
     Barry Abrams
     State Bar No. 00822700
     Babrams@BlankRome.com
     Jack W. Higdon
     State Bar No. 24007360
     Jhigdon@BlankRome.com
     BLANK ROME LLP
     700 Louisiana, Suite 4000
     Houston, Texas 77002
     (713) 228-6601
     (713) 228-6605 (Fax)

ATTORNEYS FOR APPELLANT
TEXAS MUNICIPAL LEAGUE JOINT
SELF-INSURANCE FUND *A/K/A* THE TEXAS
MUNICIPAL LEAGUE INTERGOVERNMENTAL
RISK POOL

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was forwarded to the following counsel of record by email and United States First Class Mail, certified, return receipt requested, on April 16, 2015:

*Via Email & Certified Mail,*
*RRR No. 70071490000022311663*
Mr. Anthony Constant
CONSTANT LAW FIRM
One Shoreline Plaza
800 N. Shoreline Blvd, Suite 2700 South
Corpus Christi, Texas 78401
Fax: 361-887-8010

/s/ Barry Abrams
Barry Abrams

# TAB "A"

# Texas Municipal League
# Intergovernmental Risk Pool

211 East Seventh Street, Suite 500, Austin, Texas 78701

## LIABILITY/PROPERTY INTERLOCAL AGREEMENT

This Contract and Interlocal Agreement is entered into by and between political subdivisions of this state (hereinafter referred to as "Pool Members") to form a joint self-insurance pool to be named the Texas Municipal League Joint Self-Insurance Fund (hereinafter referred to as the "Fund") for the purpose of providing coverages against risks which are inherent in operating a political subdivision.

### WITNESSETH:

The undersigned Pool Member, in accordance with the Interlocal Cooperation Act, Article 4413 (32c), T.R.C.S. and the interpretation thereof by the Attorney General of the State of Texas (Opinion #MW-347, May 29, 1981), and in consideration of other political subdivisions executing like agreements, does hereby agree to become one of the Pool Members of this self-insured pool. The conditions of membership agreed upon by and between the parties are as follows:

1.  Definitions of terms used in this Interlocal Agreement.

    a.  Board. Refers to the Board of Trustees of the Texas Municipal League Joint Self-Insurance Fund.

    b.  Fund Year. 12:01 a.m. October 1 through 12:01 a.m. the following October 1.

    c.  Manual Rates. The basic rates applicable to each liability classification promulgated by the Insurance Service Office or the Board of Trustees.

    d.  TML Municipal Liability Self-Insurance Plan. The liability coverage document that sets forth in exact detail the coverages provided as part of the overall plan.

    e.  Adjustments. Refers to any offsets to manual premium that may result from the Pool Member's election of deductibles, loss experience or Fund Modifier which reflects the savings to the Pool Member by entering into this Agreement.

    f.  TML Municipal Property Self-Insurance Plan. The property coverage document that sets forth in exact detail the coverages provided as part of the overall plan.

    g.  Premium and Contribution. Used interchangeably in some parts of this Interlocal Agreement. Any reference at any time in this Interlocal Agreement to an insurance term not ordinarily a part of self-insurance shall be deemed for convenience only and is not construed as being contrary to the self-insurance concept except where the context clearly indicates no other possible interpretation such as but not limited to the reference to "reinsurance."

    h.  Reimbursable Deductible. The amount that was chosen by this Pool Member to be applicable to the first monies paid by the Fund to effect judgment or settlement of any claim or suit. The Pool Member, upon notification of the action taken, shall promptly reimburse the Fund for all or such part of the deductible amount as has been paid by the Fund. Further, however, the Fund's obligation to pay damages shall be subject to the Limits of Liability stated in the Declarations of Coverage or Endorsements to this Interlocal Agreement less the stated deductible amount.

    i.  Fund Modifier. A percentage figure that is applied to the manual rates by the Fund to reflect the savings to the Pool Member by entering into the Interlocal Agreement.

    j.  Agreement Period. The continuous period since the Pool Member first became a member of this Fund excluding, however, any period or periods of time therein that the member did not participate as a member of the Pool.

    k.  Declarations of Coverage. The specific indication of the coverages, limits, deductibles, contributions and special provisions elected by each individual Pool Member. The Declarations of Coverages may be modified by Endorsement.

2.  The Board of Trustees, acting through its agents and Fund staff, is responsible for the administration of all Fund business on behalf of the Pool Members.

Revised 10/90

72

3. In consideration of the execution of this Agreement by and between the Pool Member and the Fund and of the contributions of the Pool Member, the coverage elected by the Pool Member is afforded according to the terms of the TML Liability Self-Insurance Plan and the TML Property Self-Insurance Plan. The affirmative declaration of contributions and limits of liability in the Declarations of Coverage and Endorsements determines the applicability of the Self-Insurance Plans.

Each Pool Member agrees to adopt and accept the coverages, provisions, terms, conditions, exclusions and limitations as further provided for in the TML Self-Insurance Plans or as specifically modified by the Pool Member's Declarations of Coverage. This Interlocal Agreement shall be construed to incorporate the TML Liability Self-Insurance Plan and/or theTML Property Self-Insurance Plan, Declarations of Coverage, and Endorsements and addenda whether or not physically attached hereto.

4. It is understood that by participating in this risk sharing mechanism to cover liability exposures, the Pool Member does not intend to waive any of the immunities that its officers or its employees now possess. The Pool Member recognizes the Texas Tort Claims Act and its limitations to certain governmental functions as well as its monetary limitations and that by executing this Agreement does not agree to expand those limitations.

The Pool Member, upon the execution of this Agreement, shall supply the Fund with a current copy of its charter provisions or ordinance that sets out its requirement as to the number of days in which a third party liability claim must be made against it.

If the Pool Member does not have such an ordinance provision that establishes a set number of days or if it has an ordinance provision which provides for less than sixty (60) days notice and for good cause shown up to six (6) months notice the Pool Member agrees to adopt an ordinance providing for such notice reasonably describing the damage or injury claimed and the time, manner and place of the incident from which it arose. The notice requirement shall not be changed by the Pool Member without first giving the Fund thirty (30) days written notice. Violation of this provision may, at the Fund's discretion, void this Interlocal Agreement.

5. The term of this Agreement and the self-insurance provided to the Pool Member shall be continuous commencing 12:01 a.m. on the date designated in this Agreement until terminated as provided below. Although the self-insurance provided for in this Agreement shall be continuous until terminated, the limit of liability of the Fund under the coverages that the Pool Member elects shall be limited during any Fund Year to the amount stated in the Declarations of Coverage for that Fund Year.

This Agreement may be terminated by either party giving to the other sixty (60) days prior written notice of intent to terminate except the Pool Member may terminate this Agreement and its coverages thereunder without giving the sixty (60) days notice if the reason is because of a change by the Fund in the Pool Member's contribution, coverage, or other change in the limits of liability, terms, conditions, exclusions and limitations provided for in the Texas Municipal League Self-Insurance Plans provided that no termination by the Member shall be effective prior to the date that written notice of termination is actually received in the offices of the Texas Municipal League Joint Self-Insurance Fund and provided that the Pool Member agrees to and shall pay the applicable premium and contribution for those coverages It is terminating until the date the notice of termination is actually received by the Fund.

The Fund shall provide the Pool Member with Declarations of Coverage and any Endorsements that determine the applicability of the Texas Municipal League Self-Insurance Plans annually by December 1. Such Declarations of Coverage shall include, but not be limited to, the coverage period which shall be the applicable Fund Year, limits, deductibles, contributions, special provisions and limitations. Changes made during the Fund Year, whether requested by the Pool Member or required by the Fund, will be handled by Endorsement.

It is the intention of the parties that the Pool Member's coverages under this Agreement shall remain in full force and effect from Fund Year to Fund Year, subject to the limits of liability that the Fund can provide each Fund Year and the terms, conditions, limitations that the Fund may require to protect its solvency and to comply with reinsurance requirements, until notice of termination is given as herein provided. Realizing that the Pool Member needs the earliest possible information concerning the Fund coverages, limits, and exclusions and the Pool Member's contribution that will be required for any new Fund Year, the Fund will endeavor to provide this information as soon as possible before the beginning of each Fund Year. The parties recognize, however, that conditions in the reinsurance industry are such that the Fund may not be able to provide this information to the Pool Member before the beginning of a Fund Year for various reasons including the failure of the Pool Member to timely submit the appropriate exposure summary or delays on the part of reinsurers in getting information to the Fund, and so, to protect the Pool Member from gaps in its coverage and to protect the solvency of the Fund, the parties agree as follows:

*If, for any reason other than the Pool Member's failure to provide the information requested in the exposure summary, the Fund has not been able to provide the Pool Member with information concerning available coverages for a new Fund Year or advise the Pool Member of the amount of its contribution for the new Fund Year by the beginning of the Fund Year, the Fund shall nevertheless continue the Pool Member's coverages at the same limits of liability (if still available and if not, then at the highest limit of liability available for the new Fund Year) so that the Pool Member shall at all times remain covered as herein provided and the Pool Member's*

Revised 10/90

73

*initial contributions for the new Fund Year shall be determined by a "tentative contribution" as determined by the Board with the Pool Member's actual annual contribution to be credited by the amount paid in accordance with the tentative contribution and adjusted during the Fund Year. In the event the Pool Member does not wish to have its coverages extended or renewed at the end of any Fund Year, the burden shall be upon the Pool Member to give written notice to the Fund as provided hereinabove and the Pool Member agrees to pay as hereinabove stated all contributions or pro rata contributions until the date such written notice is received in the offices of the Fund or the date of termination of this Agreement, whichever is later.*

6.    Commensurate with the execution of this Agreement and annually thereafter, the Pool Member shall complete the appropriate exposure summary and deliver it or cause it to be delivered to the Fund, or, if so instructed, to a designated contractor, no later than September 1 of each year and new annual contributions shall be calculated using manual rates times exposure, less any adjustments. Intentional or reckless misstatements on the exposure summary shall be grounds for cancellation. In the event that the Pool Member fails or refuses to submit the appropriate exposure summary, the Fund reserves the right to terminate such Pool Member by giving thirty (30) days written notice and to collect any and all contributions that are earned pro rata for the period preceding contract termination.

The Pool Member agrees to pay the annual contribution to the Fund in four (4) equal quarterly installments, in advance, commencing at the beginning of this Agreement with subsequent installments due the first quarter thereafter. Pool Members who elect a deductible in excess of $25,000 shall comply with the monthly payment schedule outlined to them in advance of assuming such a large deductible. In the event this Agreement is terminated as herein provided, the Fund shall promptly repay to the Pool Member any such unearned annual contribution prorated as of the date of termination and the Pool Member agrees during the term of this Agreement to promptly pay all reimbursable deductibles upon receipt of statement.

At the end of each and every Fund Year, the Fund may require the Pool Member to submit the actual data requested on the exposure summary as reflected by the books and records of the Pool Member. The Fund reserves the right to audit the records of any Pool Member and adjust contributions accordingly.

In the event that the Pool Member fails or refuses to make the payments, including accrued interest, as herein provided, the Fund reserves the right to terminate such Pool Member by giving them ten (10) days written notice and to collect any and all amounts that are earned pro rata for the period preceding contract termination. If the amounts owed, including reimbursable deductibles, have to be collected by suit, the Pool Member agrees to pay attorneys' fees and costs incurred in such suit.

7.    The Fund shall maintain adequate protection from catastrophic losses to protect its financial integrity. Aggregate protection shall also be maintained. The Member's contributions shall be limited to that amount as calculated under this Agreement.

8.    Notwithstanding the provisions of the foregoing paragraph, it is agreed the Board shall have the right to adjust the financial protection outlined above and/or amend coverages as it finds available or deems necessary to maintain the fiscal soundness of the Fund at the beginning of or during any Fund Year.

9.    The Fund will make available loss control services to the Pool Members to assist them in following a plan of loss control that may result in reduced losses. The Pool Member agrees that it will cooperate in instituting any and all reasonable loss control recommendations. In the event that the recommendations submitted seem unreasonable, the Pool Member has a right to appeal to the Board of Trustees. The Board shall hear the objections of the Pool Member at its next regularly scheduled meeting and its decisions will be final and binding on all parties. Any Pool Member who does not agree to follow the decision of the Board shall be withdrawn from the Fund immediately.

10.   The Pool Member agrees that it will appoint a contact of department head rank, and the Fund shall not be required to contact any other individual except this one person. Any notice to or any agreements with the contact shall be binding upon the Pool Member. The Pool Member reserves the right to change the contact from time to time by giving written notice to the Fund.

11.   The Fund agrees to handle all liability and property claims, and provide a defense for any and all liability claims covered under this Agreement after prompt notice has been given. The Pool Member hereby appoints the Fund staff and Contractors as its agents to act in all matters pertaining to processing and handling of claims covered under this Agreement and shall cooperate fully in supplying any information needed or helpful in settlement or defense of such claims. As respects liability claims, the Fund staff and Contractors shall carry on all negotiations with the claimant and his attorney and negotiate within authority previously granted by the Fund. If a personal appearance by the Pool Member or an employee is necessary, the expense of this appearance will not be the responsibility of the Fund. With the advice and consent of the Fund, the Fund staff and the Contractors will retain and supervise legal counsel for the prosecution and defense of any litigation. All decisions on individual cases shall be made by the Fund through the Fund staff and the Contractors, which includes the decision to appeal or not to appeal. However, any Pool Member shall have the right in any case to consult with the Fund on any decision made by the Fund staff or Contractors. The Board shall hear the objections of the Pool

Revised 10/90

Member at its next regularly scheduled meeting and its decision will be final and binding on all parties. Any suit brought or defended by the Fund shall be brought or defended only in the name of the Pool Member and/or its officers or employees. There shall be supplied periodically to each Pool Member a computer printout involving a statement of claims. As respects the TML Municipal Liability Self-Insurance Plan, the Fund shall have priority in enforcing its subrogation claims against the claims of Pool Member except as to claims of the Texas Municipal League Workers' Compensation Joint Insurance Fund, which shall take preference.

12. The Pool Member acknowledges that it has received a copy of the Bylaws of the Fund and agrees to abide by the Bylaws and any amendments thereto.

13. The Fund agrees that all Fund transactions will be annually audited by a nationally recognized certified public accounting firm.

14. If legally required, the Fund shall cause to be filed the necessary tax forms with the Internal Revenue Service.

15. As the administrators of the Fund, the Board shall primarily and consistently keep foremost in their deliberations and decisions in operating the Fund that each of the participating Pool Members is a "self-insured." At least annually, the Board shall carefully review, study and consider the actual claims or loss experience (including reserves for future claims payments) of each of the Pool Members, the pro rata savings to the Fund resulting from overall loss experience attributed to each Pool Member, and the pro rata portion of the cost of all catastrophic loss protection and aggregate stop loss protection allocated to each Pool Member as well as the pro rata allocation, as determined by the Board of the other and necessary administrative expenses of the Pool, in order to reasonably determine the actual pro rata cost, expense and loss experience of each Pool Member in order to maintain as nearly as possible an equitable and reasonable self-insurance administration of the Fund as applied to each Pool Member.

The Fund shall maintain case reserves and supplemental reserves computed in accordance with standard actuarial principles, taking into account historical and other data, designed to measure claims development and claims incurred but not yet reported, so that funds will be available to meet these claims as they become due. The Fund shall also establish and maintain a reserve for Return of Contributions to further ensure the fiscal integrity of the Fund in the event of a potential adverse loss development. Only current Pool Members may receive return of contribution.

16. The Pool Member may elect to participate in the Fund only to the extent of obtaining administrative services, and, if desired and available, reinsurance. In that event, the Pool Member shall not make contributions as provided in Paragraph 5 nor receive the coverages provided for in the TML Self-Insurance Plan, nor shall the TML Joint Self-Insurance Fund be liable for the payment of claims against the Pool Member. The Fund shall only handle and service claims for the Pool Member and pay same out of funds to be deposited by the Pool Member in a separate account administered by the Fund for the payment of claims and judgments only against that Pool Member as hereinafter provided.

Notwithstanding the provisions of any other section of this Interlocal Agreement, a Pool Member who elects to receive Administrative Services Only as specified in the attached Declarations (hereinafter referred to as the "ASO Pool Member") shall be subject to the following requirements and conditions:

A. Although the ASO Pool Member will receive coverage documents setting forth the coverages, provisions, terms, conditions, exclusions and limitations provided for in the TML Self-Insurance Plans, these documents are not intended to and shall not create an insured-insurer relationship between the Fund or any of its other Pool Members and the ASO Pool Member, but rather are provided solely for the purposes of: (1) defining the scope of claims the Fund will handle on behalf of the ASO Pool Member, and (2) defining the nature and scope of claims and conditions applicable thereto that will be covered by reinsurance, if available and obtained by the ASO Pool Member, beyond the ASO Pool Member's self-insured retention. The Fund shall not itself be liable for the payment of claims or judgments against the electing ASO Pool Member, nor to provide the electing ASO Pool Member with a defense of any such claims or suits at the expense of the Fund. The Fund will only make payments on behalf of the ASO Pool Member out of the ASO Pool Member's claims account. The ASO Pool Member shall comply with all requirements of any reinsurer including but not limited to furnishing timely claims reports, proposed settlements that would impact the reinsurer as well as progress reports involving litigation. The ASO Pool Member further agrees to hold the Fund harmless from any and all claims (including attorney fees) that may be asserted against the Fund for the non-payment of any claims due to the failure of the ASO Pool Member to maintain adequate reserves for the payment of claims as well as claims based upon breach of a duty of good faith and fair dealing because of the ASO Pool Member's or their agents' conduct toward the claimant.

B. In connection with claims within the scope of the coverage documents, the Fund shall provide the following services or on behalf of the ASO Pool Member as confirmed specifically in the attached Declarations:

1. Overall contract and claims administration;

Revised 10/90

2. Loss control services to the ASO Pool Member to assist it in developing a plan of loss control to attempt to control or reduce the frequency and severity of claims against it;

3. Claims servicing including investigation and recommendation by the Fund's contractors; periodic meetings with the ASO Pool Member's claims official or claims committee attended by representatives of Contractors;

4. Claims administration including coordination and recommendation of defense; reserve recommendations; claims handling and defense recommendations by the Fund claims manager and assistants, as well as review of all files to monitor the ASO Pool Member's self-insurance exposure; participation by Fund staff member(s) in the periodic meetings to review claims with the ASO Pool Member's claims official or claims committee.

5. Storage and retention of claims records; periodic MIS reports detailing claims and loss information and history.

The Fund shall charge the ASO Pool Member its usual and customary charges for the aforesaid services based on actual services provided. Allocated claim expenses, including defense attorney's fees, discovery fees, expert and witness fees and court costs shall be paid by the Fund on behalf of the ASO Pool Member out of the ASO Pool Member's claims account as part of the administrative services provided by the Pool, but shall never be an expense or liability of the Fund but rather is solely that of the ASO Pool Member.

The Fund shall handle all liability and automobile physical damage claims and oversee, coordinate and make recommendations in connection with the defense of any and all liability lawsuits covered under this Agreement after prompt notice has been given. The ASO Pool Member hereby appoints Fund staff and Contractors as its agents to act in all matters pertaining to processing and handling of claims covered under this Agreement and shall cooperate fully in supplying any information needed or helpful in settlement or defense of such claims. As respects liability claims, the Fund staff and Contractors shall carry on all negotiations with the claimant or his attorney, but no settlement shall be made without express prior approval of the ASO Pool Member. All claims will be discussed with the ASO Pool Member's claims official or claims committee on a periodic basis. As information on each claim develops, the Fund staff and Contractors shall make recommendations concerning claim reserves, settlement and whether or not a case should be tried or settled or a judgment should be appealed, but all decisions on individual cases shall be made by the ASO Pool Member. In the event of litigation, the Fund staff and Contractors will retain on behalf of the ASO Pool Member legal counsel approved by the ASO Pool Member to represent it and will supervise the defense of the litigation, including any appeals.

The ASO Pool Member shall establish in its name a "claims account" at a bank designated by the Fund, out of which the Fund, through its agents, shall pay on behalf of the ASO Pool Member qualified claims or losses and allocated claims expense including court costs, fees and expenses of attorneys, independent investigators, experts and witnesses and all other costs, charges or expense properly chargeable to a qualified claim or loss. Funds shall be provided at the inception of the ASO Member's self-insurance program and promptly from time to time under the following formula based on estimates furnished by the Fund of the anticipated or actual level and volume of qualified claims or losses and allocated expenses: The ASO Pool Member shall deposit into the account initially an amount equal to one-fourth (1/4) of the estimated volume of qualified claims or losses and allocated claim expenses during the first twelve (12) months of its self-insurance program and each month thereafter, or sooner if necessary, shall deposit into the account an amount sufficient to restore, maintain or increase the account balance to an amount equal to one-fourth (1/4) of the estimated volume of qualified claims or losses and allocated claim expenses during the next twelve (12) months.

The Fund shall account to the ASO Pool Member monthly for all expenditures from the claims account. If at any time the claims account balance drops to below fifty percent (50%) of the balance currently called for under the above formula, the ASO Pool Member shall promptly deposit additional funds to restore the full balance. During any period of time that the claims account balance is fifty percent (50%) or less of that currently called from under the formula, only allocated claim expenses shall be paid out and the ASO Pool Member shall directly pay qualified claims or losses out of other funds until it deposits into the claims account the amount necessary to restore the account to its full balance. In the event payment of a qualified claim or loss would reduce the claims account balance to less than fifty percent (50%) of that called for under the formula, the ASO Pool Member shall be promptly notified and shall either pay the qualified claim or loss directly out of other funds or deposit into the claims account sufficient funds for its payment.

It is expressly understood that the Fund shall not be required to advance its own funds or those of the Joint Self-Insurance Fund to pay claims or losses or allocated expenses hereunder, or continue to perform any services hereunder if the ASO Pool Member fails to provide necessary and adequate funds as herein set forth.

It shall be the sole responsibility of the ASO Pool Member to establish and maintain adequate reserves in addition to the limited funds in claims account for payment of all claims, including catastrophic claims. The Fund will provide reserve recommendations and estimates of liability exposures, but both parties realize that judges and juries have wide discretion in assessing damage awards and the award in any particular case may be greatly in excess of or greatly less than a recommended reserve.

Either party to this agreement may at any time terminate it upon sixty (60) days written notice for any reason as to either all pending and future claims, or alternatively, only as to future claims. In the event cancellation is with respect to both pending and future claims, the Fund will no longer be obligated to perform the services outlined in this Agreement and shall promptly and in an orderly manner forward to the ASO Pool Member or its designee all pending claim files. In the event termination is only as to future claims, this Agreement shall continue full force and effect with respect to all pending claims and claims occurring but not reported prior to cancellation until concluded. In either event, the ASO Pool Member shall be entitled, if it so requests and at its own expense, to have the closed claim filed retrieved from storage and delivered to it. In the event the ASO Pool Member does not request closed files in the notice of cancellation, however, they will be retained or destroyed at the Fund's option and the ASO Pool Member shall have no recourse against the Fund for failure to retain them.

RECEIVED

MAY 0 3 '94

UNDERWRITING

## TO BE COMPLETED BY MEMBER:

**EMPLOYER MEMBERS' FUND CONTACT (See Section 10):**

Member Name ___ Housing Authority of the City of Alice ___

Name of Contact ___ Alfonso Trevino ___ Title ___ Executive Director ___

Mailing Address ___ P.O. Box 1407 ___

Street Address (if different from above) ___ 125 Olmito St. ___

City ___ Alice ___ Zip ___ 78333 ___ Phone ___ (512)664-3453 ___

_____ Alfonso Trevino.
**SIGNATURE OF AUTHORIZED MEMBER OFFICIAL**

Executive Director _____ 5/4/94 _____
**Title** _____ **Date**

Member's Federal Tax I.D. Number 7 4 - 1 5 4 9 9 7 5
**This Information is MANDATORY**

## TO BE COMPLETED BY FUND: (OFFICE USE ONLY)

Effective Date of This Agreement ___ 5|13|94 ___

Member Name ___ Alice HA ___

Contract Number ___ C8723 ___

_____
**SIGNATURE OF AUTHORIZED FUND OFFICIAL**

**Fund Secretary** _____ 5|6|94 ___
**Title** _____ **Date**

Revised 10/90

# TAB "B"

78

# PROPERTY
## Coverage Document



P-300
10-01-09
Keep in permanent files



VOL 0 0 1 PAGE 0 0 1 8

# Texas Municipal League
# JOINT SELF-INSURANCE FUND
# Property Coverage Document

## OCTOBER 1, 2009

Texas Municipal League Intergovernmental Risk Pool
1821 Rutherford Lane, First Floor • Austin, Texas 78754
P.O. Box 149194 • Austin, Texas 78714-9194
(512) 491-2300 • (800) 537-6655
www.tmlirp.org

# TABLE OF CONTENTS

GENERAL DEFINITIONS ............................................................................................................... 1

GENERAL EXCLUSIONS ............................................................................................................. 3

GENERAL CONDITIONS
Limits of Liability ......................................................................................................................... 4
Deductible ................................................................................................................................... 4
Other Insurance .......................................................................................................................... 4
In Case of Loss ........................................................................................................................... 4
Certificates of Insurance ............................................................................................................. 5
Titles of Paragraphs ................................................................................................................... 5
Inspection .................................................................................................................................... 6
Contribution Adjustment .............................................................................................................. 6
Errors or Omissions .................................................................................................................... 6
Interpretation ............................................................................................................................... 6

SPECIAL FORM PROPERTY COVERAGE
Perils Covered ............................................................................................................................. 7
Perils Excluded ........................................................................................................................... 7
Coverage ..................................................................................................................................... 8
Valuation .................................................................................................................................... 14
Additional Coverages ................................................................................................................ 15

NAMED PERIL COVERAGE OPTION .......................................................................................... 16

FLOOD COVERAGE OPTION....................................................................................................... 18

BOILER & MACHINERY COVERAGE OPTION ............................................................................ 19

REPLACEMENT COST OPTION................................................................................................... 20

ELECTRONIC DATA PROCESSING EQUIPMENT COVERAGE OPTION.................................... 21

MOBILE EQUIPMENT COVERAGE OPTION............................................................................... 22

CRIME COVERAGE OPTION
General ...................................................................................................................................... 23
Public Employee Dishonesty Coverage..................................................................................... 25
Theft, Disappearance, and Destruction Coverage ..................................................................... 26
Forgery or Alteration Coverage ................................................................................................. 27
Computer Fraud Coverage ........................................................................................................ 28

ANIMAL MORTALITY/THEFT AND MEDICAL COVERAGE OPTION
Animal Mortality and Theft Coverage ........................................................................................ 30
Loss of Use Coverage ............................................................................................................... 31
Canine Veterinary Fee Coverage .............................................................................................. 32
Surgical Coverage ..................................................................................................................... 33

P300
10-1-09

# GENERAL DEFINITIONS

A.  **ACTUAL CASH VALUE** means the lesser of:

 1.  The cost to repair;

 2.  The cost to replace with like kind and quality less proper deduction for depreciation; or

 3.  The amount actually expended to replace, if replaced.

B.  **AGREEMENT** means the Interlocal Agreement executed between the **Fund** and the **Member** designating those coverages, limits, and deductibles of the **Plan** adopted by the **Member.**

C.  **AUTOMOBILE** means a land motor vehicle, trailer, or semi-trailer designed for travel on public roads (including any machinery, equipment, tools, or apparatus attached thereto and not intended to be removed or used off of or away from the vehicle), but does not include **mobile equipment.**

D.  **DECLARATIONS** means the document which sets forth information that identifies, by **Member,** the types of coverage to be provided by the **Fund,** the amounts of any deductible, the coverage period, the limits of liability of the **Fund** including any aggregate limit, the **Fund** contribution, and any endorsements to this coverage that may be appended to the **declaration** or referred to in the **declaration,** and such other information matters as determined by the **Fund** operator and/or the **Fund** administrator.

E.  **EARTHQUAKE** means a shaking or trembling of the earth that is volcanic or tectonic in origin.

 **Earthquake:** Each loss by **earthquake** shock or volcanic action shall constitute a single claim hereunder; provided, if more than one such **earthquake** shock or volcanic action shall occur within any period of 72 hours during the term of the **Agreement,** such **earthquake** shock or volcanic action shall be deemed to be a single loss within the meaning thereof. The **Fund** shall not be liable for any loss occurring after the expiration date and time of the **Agreement.**

 However, the **Fund** will be liable for any losses occurring for a period of up to 72 hours after the expiration of the **Agreement** provided that the first **earthquake** damage occurs prior to the date and time of the expiration of the **Agreement.**

F.  **ELECTRONIC DATA PROCESSING EQUIPMENT** means an assemblage of electronic machine components capable of accepting instruction and information, processing the information according to the instruction, and producing desired results.

G.  **FUND** means the Texas Municipal League Joint Self-Insurance **Fund.**

H.  **FUND MEMBER** means the political subdivision within the State of Texas which is a present participant in the **Fund.**

I.  **FUND YEAR** means the period beginning at 12:01 a.m. on the effective date and ending at 12:01 a.m. on the anniversary date set forth in the **declarations.**

J.  **INSURANCE** means the "self-insurance" provided under the **Agreement.**

K.  **MEMBER** means the same as **Fund Member.**

L.  **MOBILE EQUIPMENT** means any of the following types of land vehicles, including any attached machinery or equipment:

 1.  Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;

 2.  Vehicles maintained for use solely on or next to premises owned by or rented to the **Member** and not licensed for highway use;

 3.  Vehicles that travel on crawler treads;

 4.  Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

  a.  Power cranes, shovels, loaders, diggers, or drills; or

  b.  Road construction or resurfacing equipment such as graders, scrapers, or rollers;

 5.  Vehicles not described in 1, 2, 3, or 4 above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

  a.  Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment; or

  b.  Cherry pickers or similar devices used to raise or lower workers;

 6.  Vehicles not described in 1, 2, 3, or 4 above maintained primarily for purposes other than the transportation of persons or cargo.

P300
10-1-09

However, self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment but will be considered automobiles:

1. Equipment designed primarily for:

    a. Snow removal;

    b. Road maintenance, but not construction or resurfacing;

    c. Street cleaning;

    d. Firefighting;

2. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

3. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geophysical exploration, lighting, and well servicing equipment.

M. **PLAN** means the plan of **insurance** offered its **Members** by the **Fund** and as more specifically designated in the **Agreement**.

N. **REPLACEMENT COST** shall be the least of the following:

1. The cost to repair;

2. The cost to replace new for old with like kind and quality; or

3. The amount actually expended to replace.

O. **TERRITORY** means the 50 states of the United States, the District of Columbia, and Canada, including infrequent trips to Mexico that:

1. Do not exceed 25 miles from the boundary of the United States of America; and

2. Do not exceed 10 consecutive days at any one time.

P. **TERRORISM** means the use of violence and threats to intimidate or coerce for political ends and/or purposes and includes any use of violence or threats for the purpose of putting the public or any section of the public in fear.

Q. **VALUABLE PAPERS AND RECORDS** means written, printed, or otherwise inscribed documents and records, including but not limited to books, maps, films, drawings, abstracts, deeds, mortgages, micro-inscribed documents, manuscripts, and media, but not including money and/or **securities**.

The term media includes:

1. Processing, recording or storage films, tapes,

cards, disks, drums, cartridges, or cells used for electronic data processing operations; and

2. Data, information, and instructions stored on processing, recording or storage films, tapes, cards, disks, drums, cartridges, or cells used for electronic data processing operations.

The term **securities** shall mean all negotiable and nonnegotiable instruments and/or contracts representing either money or other property, and includes revenue and other stamps in current use, tokens, and tickets, but does not include money.

# GENERAL EXCLUSIONS

This **Agreement** does not cover loss or damage caused by or resulting from:

A. Hostile or warlike action in time of peace or war, including action in hindering, combating, or defending against an actual, impending, or expected attack:

1. By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces;

2. By military, naval, or air forces; or

3. By an agent of any such government, power, authority, or forces.

B. The discharge of any weapon employing atomic fission or fusion.

C. Rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating, or defending against such occurrence.

D. Seizure or destruction by order of public authority, except destruction by order of public authority to prevent the spread of fire or explosion.

E. Risks of contraband or illegal trade.

Notwithstanding the above provisions of paragraphs A, B, C, D, and E, this **Agreement** shall cover loss or damage directly caused by acts committed by an agent of any government, party, or faction engaged in war, hostilities, or warlike operations, provided such agent is acting secretly and not in connection with any operation of armed forces (whether military, naval, or air forces) in the country where the property is situated. Nothing in the foregoing shall be construed to include any loss, damage, or expense caused by or resulting from any of the risks or perils excluded above, excepting only the acts of certain agents expressly covered herein, but in no event shall this coverage include any loss, damage, or expense caused by or resulting from any weapon of war employing atomic fission or radioactive force whether in time of peace or war.

F. Actual, alleged, or threatened release, discharge, dispersal, seepage, migration, or escape of pollutants at any time, unless caused by a peril covered under the Named Peril Coverage Option. The term "pollutant" as used in this clause is defined as any solid, liquid, gaseous, or thermal irritant or contaminant, including but not limited to vapor, fumes, acids, alkalis, chemicals, and/or waste.

G. Nuclear reaction, nuclear radiation, or radioactive contamination, all whether controlled or uncontrolled, and whether such loss be direct or indirect, proximate or remote, or be in whole or in part caused by, contributed to, or aggravated by the peril(s) covered in this **Agreement**; except:

1. If fire ensues, liability is specifically assumed for direct loss by such ensuing fire, but not including any loss due to nuclear reaction, nuclear radiation, or radioactive contamination;

2. The **Fund** shall be liable for loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage for each occurrence from material used or stored or from processes conducted on covered premises, provided at the time of loss there is neither a nuclear reaction capable of sustaining nuclear fission in a self-supporting chain reaction nor any new or used nuclear fuel on the covered premises.

P300
10-1-09

# GENERAL CONDITIONS

## I. LIMITS OF LIABILITY

The **Fund** shall not be liable for more than the amount specified in the **Agreement** for any one loss, disaster, or casualty, nor in any one **Fund Year** for more than the aggregate limits shown for the perils of **flood** or **earthquake.**

## II. DEDUCTIBLE

A. For each **Member** all losses, damages, or expenses arising out of any one occurrence shall be adjusted as one loss, and from the amount of such adjusted loss shall be deducted the sum selected by each **Member** as shown in the **Agreement.**

Whether an occurrence involves a loss at one or more locations, the deductible amount shall apply against the total loss(es) incurred by the **Member** from any one occurrence.

B. If two or more deductible amounts in this **Agreement** apply to a single occurrence per **Member**, the total to be deducted shall not exceed the largest deductible applicable.

## III. OTHER INSURANCE

### A. EXCESS INSURANCE

Excess insurance is insurance over the limit of liability set forth in this **Agreement.** The existence of such excess insurance shall not prejudice the coverage provided under this **Agreement** nor will it reduce any liability hereunder.

### B. UNDERLYING INSURANCE

1. Should the **Member** elect to maintain insurance on the actual cash value of a property, under the National Flood Insurance Act, as amended, this **Agreement** shall cover excess of loss over the maximum amount of insurance permitted under the Act.

2. Any other underlying insurance shall be considered "other insurance."

### C. OTHER INSURANCE

Except for insurance as described as excess or underlying insurance, this **Agreement** shall not cover to the extent of any other insurance, whether prior or subsequent hereto in date, and whether directly or indirectly covering the same property against the same perils. The **Fund** shall be liable for loss or damage only to the extent of that amount in excess of the amount recoverable from such other insurance.

## IV. IN THE CASE OF LOSS

### A. NOTICE OF LOSS

As soon as practicable after any loss or damage occurring under this **Agreement** is known to the **Member** or its agent, the **Member** shall report such loss or damage to the **Fund** or its agent.

### B. ASSISTANCE AND COOPERATION OF THE FUND MEMBER

The **Member** shall cooperate with the **Fund** and, upon the **Fund's** request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

### C. PROTECTION FROM FURTHER DAMAGE

In the event property covered herein sustains a loss from or is damaged by a peril covered herein, the **Member** shall take all reasonable steps to protect the property from further damage, and keep a record of such expenses necessary to protect the property, for consideration in the settlement of the claim. Such expenses shall not increase the limits of liability under the **Agreement.** The **Fund** shall not pay for any subsequent loss or damage resulting from a peril not covered herein. If feasible, the **Member** shall set the damaged property aside and in the best possible order for examination.

### D. PROOF OF LOSS

It shall be necessary for the **Member** to render a signed and sworn proof of loss to the **Fund** or its appointed representative, within 60 days, stating the place, time, and cause of the loss, damage, or expense, the interest of the **Member** and of all others, the value of the property involved in the loss, and the amount of loss, damage, or expense.

### E. APPRAISAL

If the **Member** and the **Fund** fail to agree as to the amount of loss, each shall, upon the written demand either of the **Member** or of the **Fund** made within 60 days after receipt of proof of loss by the **Fund**, select a competent and disinterested appraiser. The appraisers then shall select a competent and disinterested umpire. If they should fail for 15 days to agree upon such umpire, then upon request of the **Member** or of the **Fund**, such

umpire shall be selected by a judge of a court of record in the county and state in which such appraisal is pending. Then, at a reasonable time and place, the appraisers shall appraise the loss, stating separately the value at the time of loss and the amount of loss. If the appraisers fail to agree, they shall submit their differences to the umpire. An award in writing by any two shall determine the amount of loss. The **Member** and the **Fund** shall each pay its chosen appraiser and shall bear equally the other expenses of the appraisal and of the umpire.

## F. LOSS PAYABLE

Loss, if any, shall be adjusted with and payable to the **Member**, whose receipt shall constitute a release in full of all liability under this **Agreement** with respect to such loss.

## G. PAYMENT OF LOSS

All adjusted claims shall be due and payable no later than 60 days after presentation and acceptance of proofs of loss by the **Fund** or its appointed representative.

## H. REINSTATEMENT

With the exception of loss caused by perils which are subject to annual aggregate limits as noted in the **Agreement**, no loss hereunder shall reduce the amount of this **Agreement**.

## I. SUIT AGAINST THE FUND

No suit or action on this **Agreement** for the recovery of any claim shall be sustainable in any court of law or equity unless the **Member** shall have fully complied with all the requirements of this **Agreement**. The **Fund** agrees that any action or proceeding against it for recovery of any loss under this **Agreement** shall not be barred if commenced within the time prescribed therefor in the statutes of the State of Texas.

## J. SUBROGATION

1. Any release from liability entered into by the **Member** prior to loss hereunder shall not affect this **Agreement** or the right of the **Member** to recover hereunder. The right of subrogation against the **Member** is waived.

2. In the event of any payment under this **Agreement**, the **Fund** shall be subrogated to the extent of such payment to all the **Member's** rights of recovery therefor. The **Member** shall execute all papers required and shall do anything that may be necessary at the expense of the **Fund** to secure such right. The **Fund** will act in concert with all other interests concerned, i.e., the **Member** and any other entity or individual participating in the payment of any loss as primary or excess insurers, in the exercise of such rights of recovery. If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery shall be divided between the interests concerned in the proportion of their respective interests. If there should be no recovery, the expense of proceedings shall be borne proportionately by the interests instituting the proceedings.

## K. SALVAGE AND RECOVERIES

All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received subsequent to a loss settlement under this **Agreement**, shall be applied as if recovered or received prior to the said settlement and all necessary adjustments shall be made to the parties involved.

## L. MACHINERY

In case of loss or damage by a covered peril to any part of a machine or unit consisting of two or more parts when complete for use, the liability of the **Fund** shall be limited to the value of the part or parts lost or damaged or, at the **Member's** option, to the cost and expense of replacing or duplicating the lost or damaged part or parts or of repairing the machine or unit.

## M. PAIR AND SET

Except as provided under "machinery" in the event of loss or damage by a peril covered to any article or articles which are a part of a pair or set, the measure of loss or damage to such article or articles shall be a reasonable and fair proportion of the total value of the pair or set, giving consideration to the importance of said article or articles, but in no event shall such loss or damage be construed to mean total loss of the pair or set.

## V. CERTIFICATES OF INSURANCE

All parties to whom a certificate of insurance has been issued are automatically added to this **Agreement** upon issuance of said certificates, either as additional insureds or as loss payees, or both, in accordance with the terms and conditions of said certificates.

## VI. TITLES OF PARAGRAPHS

The titles of the paragraphs of this form and of amendments and supplemental contracts, if any, now or hereafter attached hereto are inserted solely for convenience of reference and shall not be deemed in

P300
10-1-09

any way to limit or affect the provisions to which they relate.

## VII. INSPECTION

The **Fund** shall be permitted but not obligated to inspect the **Member's** real and personal property at any reasonable time. An inspection is for the **Fund's** benefit only. Neither the **Fund's** right to make inspections nor the **Fund's** reports on those inspections shall constitute an undertaking on behalf of or for the benefit of the **Member** or others to determine or guarantee that the **Member's** property is safe and not harmful to health.

## VIII. CONTRIBUTION ADJUSTMENT

Prior to the beginning of each **Fund Year** the **Member** agrees to furnish the **Fund** with a statement of 100 percent values of buildings, structures, and personal property (including **valuable papers and records**), and accounts receivable and revenues covered hereunder.

The **Member** agrees that if property is acquired or constructed in excess of the amounts described in Section III.C.1. of the Special Form Property Coverage or if it is deleted in similar amounts, the **Member** will report such acquisition or deletion to the **Fund** and pay the proportionate additional contribution or receive the return contribution due from the date of acquisition or deletion.

## IX. ERRORS OR OMISSIONS

Any unintentional error or omission made in making reports by the **Member** shall not void or impair the coverage hereunder, provided the **Member** reports such error or omission as soon as reasonably possible after discovery.

This Errors or Omissions provision shall not apply to the failure of the **Member** to report property listed in Section III.B.10. of the Special Form Property Coverage section or Section III.A. of the Flood Coverage Option which requires specific reporting prior to a loss and contribution charges in order for coverage to apply.

## X. INTERPRETATION

This **Agreement** will be construed according to general rules of contract construction. This **Agreement** is drafted on behalf of all **Members** of the **Fund** and will be construed in a manner which most reasonably and accurately reflects the intent of the **Agreement**.

VOL 0 0 1 PAGE 0 0 8 6

# SPECIAL FORM PROPERTY COVERAGE

## I. PERILS COVERED

This **Agreement** covers risk of direct physical loss of or damage to property described herein occurring within the **territory**, including salvage and all other charges on shipments covered hereunder, except as hereinafter excluded.

## II. PERILS EXCLUDED

This **Agreement** does not cover loss or damage caused by or resulting from any of the following:

A. Any fraudulent or dishonest act or acts committed by the **Member's** officials or employees. "Dishonest or fraudulent acts" as used in this paragraph shall mean only dishonest or fraudulent acts committed by the **Member's** officials or employees with the manifest intent to:

1. Cause the **Member** to sustain such loss; and

2. Obtain financial benefit for the **Member's** official, employee, or for any other person or organization intended by the **Member's** official or employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment.

B. Faulty, inadequate, or defective design, specifications, materials, or workmanship; however, this exclusion shall not apply to loss or damage from a covered peril that ensues.

C. Errors in processing or manufacture of the **Member's** product unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

D. Ordinary wear and tear, rust, corrosion, smog, decay, deterioration, hidden or latent defect, dampness or dryness of atmosphere, changes in or extremes of temperature, or any quality in property that causes it to damage or destroy itself unless loss or damage by a covered peril ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

E. Mold, mildew, and fungus unless caused by a peril covered herein, but if loss or damage from a peril covered herein ensues, this **Agreement** shall cover only for such ensuing loss or damage.

F. Settling, cracking, shrinking, or expansion unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

G. Gradual subsidence unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

H. Loss of market, business interruption, or extra expense loss due to delay with respect to property in transit.

I. Electrical injury or disturbance to electrical appliances, devices, or wiring caused by electrical currents artificially generated unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

J. Mechanical breakdown unless loss or damage from a peril covered herein ensues and then this **Agreement** shall cover only for such ensuing loss or damage.

K. Explosion, rupture, or bursting of steam boilers, steam pipes, steam turbines, or steam engines owned or operated by the **Member** unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

L. Unexplained or mysterious disappearance or shortage found upon taking inventory.

M. Damage caused by:

1. Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or accompanying spray from any of the preceding, all whether driven by wind or not;

2. Mudslides or mudflows which are proximately caused by flooding as described in 1. above and are akin to a river of liquid and flowing mud on the surfaces of normally dry land areas, including the **Member's** premises, as when earth is carried by a current of water and deposited along the path of the current; or

3. The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as described in 1. above.

P300
10-1-09

N. Loss of or damage to the interior of any building or structure caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not unless:

1. The building or structure first sustains damage by a covered cause of loss to its roof or walls through which the rain, snow, sleet, ice, sand, or dust enters; or

2. The loss or damage is caused by or results from throwing of snow, sleet, or ice on the building or structure.

O. Earth movement (other than sink hole collapse) including:

1. **Earthquake**, if coverage is rejected or not accepted;

2. Landslide;

3. Mine subsidence;

4. Earth sinking, rising, or shifting; or

5. Volcanic eruption, explosion, or effusion if coverage is rejected or not accepted. But if loss or damage by fire, building glass breakage, or volcanic action results, the **Fund** will pay for that resulting loss or damage.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   a. Airborne volcanic blasts or airborne shock waves;

   b. Ash, dust, or particle matter; or

   c. Lava flow.

   All volcanic eruptions that occur within any 168 hour period will constitute a single occurrence.

   Volcanic action does not include the cost to remove ash, dust, or particle matter that does not cause direct physical loss or damage to the described property.

P. Damage caused by nesting or infestation, or discharge or release of waste products or secretions by insects, birds, rodents, or other animals.

Q. Collapse, meaning an abrupt falling down or caving in of property, unless such collapse is caused by a covered peril. But if a collapse results in a covered peril, this **Agreement** shall cover the ensuing loss or damage.

   This exclusion shall not apply to the following:

1. A collapse caused by faulty, inadequate, or defective design, specifications, materials, or workmanship, unless known to the **Member** prior to the collapse; or

2. A collapse caused by ordinary wear and tear, rust, corrosion, decay, deterioration, or vermin or insect damage that is hidden from view, unless known to the **Member** prior to the collapse.

Exclusions B, C, F, G, I, J, L, and N do not apply to property in transit.

Exclusions C, I, and J do not apply to alterations, additions, and property while in the course of construction, erection, installation, or assembly.

Exclusions I, K, M, and N do not apply to **valuable papers and records**.

## III. COVERAGE

### A. Real and Personal Property Covered

Except as hereinafter excluded, this **Agreement** covers:

1. The interest of the **Member** in:

   a. All real property owned, used, or intended for use by the **Member** at premises identified in a Property Schedule attached to the **declarations**;

   b. All personal property owned, used, or intended for use by the **Member**, including the **Member's** interest as tenant in improvements and betterments, provided values are reported at premises identified in a Property Schedule where such property is normally used, kept, or stored. Improvements and betterments are fixtures, alterations, installations, or additions made a part of the building or structure the **Member** occupies but does not own and which the **Member** acquired or made at its expense but cannot legally remove; and

   c. Real and personal property hereinafter constructed, erected, installed, or acquired including while in course of construction, erection, installation, and assembly, subject to the provisions of Section III.C.1.

   However, this does not include rented premises where the **Member** is a tenant unless identified on the schedule of real and personal property. In the event of loss or damage, the **Fund** agrees to accept and consider the **Member** as sole and

unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

2. Buildings, when considered real property covered under this **Agreement**, shall include the following:

   a. Permanently installed:

      (1) Fixtures;
      (2) Machinery;
      (3) Equipment; and
      (4) Appliances used for refrigerating, ventilating, cooking, dishwashing, or laundering;

   b. Outdoor fixtures;

   c. Personal property owned by the **Member** that is used to maintain or service the building or structure or its premises, including:

      (1) Fire extinguishing equipment;
      (2) Outdoor furniture;
      (3) Floor coverings; and
      (4) Appliances used for refrigerating, ventilating, cooking, dishwashing, or laundering.

3. The interest of the **Member** in the real property, other than rented premises, and personal property of others in the **Member's** care, custody, or control and the **Member's** liability imposed by law or assumed by contract for such property except for **automobiles.**

4. Personal property of the **Member's** officials, employees, and volunteers while used or intended for use on behalf of the **Member,** provided values are reported. Further, the limit of liability for such personal property of the **Member's** officials, employees, and volunteers shall be as shown on the **declarations** page.

5. Contractor's interests in property covered to the extent of the **Member's** liability imposed by law or assumed by contract.

**B. Real and Personal Property Excluded**

The following are excluded from coverage under this **Agreement**:

1. Land;

2. The cost of excavations, grading, backfilling, or filling;

3. Foundations of buildings, structures, machinery, or boilers if their foundations are below:

   a. The lowest basement floor; or

   b. The surface of the ground, if there is no basement;

4. Money or **securities**;

5. Growing crops, trees, shrubs, grass, or plants, except as provided under Section C. Coverage Extensions;

6. Watercraft (except rowboats and canoes), aircraft, **automobiles,** or contractors' equipment or **mobile equipment**;

7. Waterborne shipments to or from Hawaii, Puerto Rico, Virgin Islands, or Alaska; waterborne shipments via the Panama Canal;

8. Export shipments after loading on board an overseas vessel or watercraft or after ocean marine insurance attaches, whichever occurs first, or import shipments prior to discharge from the overseas vessel or watercraft or until the ocean marine insurance terminates, whichever occurs last;

9. Electrical transmission and distribution lines including poles and pole-mounted transformers;

10. Roadways, pavement, sidewalks, curbs, storm sewers, sanitary sewers, underground water and gas mains, any other underground piping, underground wiring, optic cables, telephone and communication lines and facilities (unless such optic cables, telephone and communication lines and facilities service only one covered location), bulkheads, pilings, piers, wharves, docks, fire hydrants, water tanks, water towers, water wells, street lights, traffic lights, traffic signs, bridges, tunnels, overpasses, dams, playground equipment, tennis courts, swimming pools, outdoor scoreboards (unless attached to a reported structure), and freestanding fences at parks and other locations unless reported prior to a loss and a contribution charged. This exclusion shall not apply to fences that are servicing or providing security to a building covered under this **Agreement**.

11. Animals (except for research).

**C. Coverage Extensions**

The limits applicable to the following Coverage Extensions are shown on the **declarations** unless

otherwise indicated below. Limits for these Coverage Extensions are in addition to and not included in the Real and Personal Property Limit shown on the **declarations**.

1. **Newly Acquired Property**

   This **Agreement** covers up to $1,000,000 or the Real and Personal Property Limit set forth in the **declarations**, whichever is less, for newly acquired or constructed property and property in the course of construction, alteration, or repair; provided, however, that the **Member** reports the value of such property to the **Fund** when the values accumulated during the **Fund Year** equal or exceed this additional limit. This **Agreement** does not cover property in the course of construction, alteration, or repair, if the property is under the control of the contractor performing the construction, alteration, or repair, unless the **Member** reports such property to the **Fund** prior to a loss and pays an appropriate contribution. **Mobile equipment** that is acquired during the **Fund Year** shall only be covered up to its **actual cash value** if it is not reported to the **Fund** within 30 days of acquisition. Nothing in this newly acquired property provision shall create coverage for property which is excluded from coverage under this **Agreement**.

2. **Valuable Papers and Records**

   The **Agreement** covers the cost to repair or replace the lost information on lost or damaged **valuable papers and records** for which duplicates do not exist.

3. **Accounts Receivable**

   This **Agreement** covers:

   a. All sums due the **Member** from customers, property owners, and other debtors provided the **Member** is unable to effect collection thereof as the direct result of loss or damage to records of accounts receivable;

   b. Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage;

   c. Collection expense in excess of normal collection cost and made necessary because of such loss or damage;

   d. Other expenses, when reasonably incurred by the **Member** in reestablishing records of accounts receivable following such loss or damage.

When there is proof that a loss of records of accounts receivable has occurred but the **Member** cannot more accurately establish the total amount of accounts receivable outstanding as of the date of such loss, such amount shall be computed as follows:

a. The monthly average of accounts receivable during the last available 12 months shall be adjusted in accordance with the percentage increase or decrease in the 12 months average of monthly gross revenues which may have occurred in the interim.

b. The monthly amount of accounts receivable thus established shall be further adjusted in accordance with any demonstrable variance from the average for the particular month in which the loss occurred, due consideration also being given to the normal fluctuations in the amount of accounts receivable within the fiscal month involved.

There shall be deducted from the total amount of accounts receivable, however established, the amount of such accounts evidenced by records not lost or damaged, or otherwise established or collected by the **Member**, and an amount to allow for probable bad debts which would normally have been uncollectible by the **Member**.

4. **Loss of Revenue, Extra Expense, and Rental Value**

   a. This **Agreement** covers:

      (1) **Loss of revenue**, subject to the following definitions, conditions, and exclusions:

         (a) **Loss of revenue** means the actual loss sustained by the **Member** to cover any reduction in revenue, during the period of restoration, caused by loss, damage, or destruction by any of the perils covered herein during the term of this **Agreement** to covered real and personal property.

         (b) **Revenue** means gross revenue, less charges and expenses which do not necessarily continue.

         (c) The **Fund** shall not be liable for any loss resulting from damage to or destruction of **inventory**, nor for the

time required to reproduce said **inventory**. **Inventory** shall mean goods produced or held for sale by the **Member** in the ordinary course of the **Member's** business.

(d) **Resumption of Operations**

It is a condition of this **Agreement** that if the **Member** could reduce the loss resulting from the interruption of business:

(i) By a complete or partial resumption of operation of the property covered; or

(ii) By making use of available stock, merchandise, or other property;

such reduction shall be taken into account in arriving at the amount of loss hereunder.

(e) **Experience of the Member**

(i) In determining the amount of loss of revenues, charges, and expenses covered hereunder for the purposes of ascertaining the amount of loss sustained, due consideration shall be given to the experience of the **Member** before the date of damage or destruction and to the probable experience thereafter had no loss occurred.

(ii) With respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly, due consideration shall be given to the probable experience of the **Member** after completion of the construction, erection, installation, or assembly.

(f) **Expense Related to Reducing Loss**

This **Agreement** also covers such expenses as are necessarily incurred for the purpose of reducing loss under this **Agreement** (except expenses incurred to extinguish fire) and such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the **Member** to reduce loss under this **Agreement**;

but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this **Agreement** is thereby reduced.

(2) **Extra expense** incurred resulting from loss or damage by any of the perils covered herein during the term of this **Agreement** to covered real or personal property.

**Extra expense** means the excess total cost necessarily incurred to continue the operations of the **Member** as nearly as reasonably practicable to normal during the period of recovery of the damaged property over and above the cost that would normally have been incurred to conduct the business during the same period had no loss or damage occurred.

(3) **Rental value** loss sustained by the **Member** resulting from the necessary untenantability caused by loss, damage, or destruction by any of the perils covered herein during the term of this **Agreement** to covered real or personal property, but not exceeding the reduction in **rental value** less charges and expenses which do not necessarily continue during the period of untenantability.

For the purposes of this **Agreement**, **rental value** is defined as the sum of:

(a) The total anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by the **Member**;

(b) The amount of all continuing charges which are the legal obligation of the tenant(s) and which would otherwise be an obligation of the **Member**; and

(c) The fair rental value of any portion of said property which is occupied by the **Member**.

In determining the amount of **rental value** covered hereunder for the purpose of ascertaining the amount of loss sustained, due consideration shall be given to the rental experience before the date of damage or destruction and to the probable experience thereafter had no loss occurred.

P300
10-1-09

This **Agreement** also covers such expenses as are necessarily incurred for the purpose of reducing loss under this **Agreement** (except expense incurred to extinguish fire) and such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the **Member** to reduce loss under this **Agreement**; but in no event shall the aggregate of such expenses exceed the amount by which the loss otherwise payable under this **Agreement** is thereby reduced.

b. The following additional provisions apply to **Loss of Revenues, Extra Expense**, and **Rental Value** coverages:

(1) **Period of Recovery**

The length of time for which loss may be claimed:

(a) Shall not exceed such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair, or replace such part of the property as has been destroyed or damaged;

(b) Such additional length of time to restore the **Member** to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

(i) The date on which the liability of the **Fund** for loss or damage would otherwise terminate; or

(ii) The date on which repair, replacement, or rebuilding of such part of the property as has been damaged is actually completed, but in no event for more than one year from said completion date;

(c) With respect to alterations, additions, and property while in the course of construction, erection, installation, or assembly shall be determined as provided in a. above but such determined length of time shall be applied to the experience of the **Member** after it has reached its planned level of operation; and

(d) Shall commence with the date of such loss or damage and shall not be limited by the date of expiration of this **Agreement**.

(2) **Special Exclusions**

This section of the **Agreement** does not cover any increase of loss which may be occasioned by the suspension, lapse, or cancellation of any lease, license, contract, or order; nor for interference at **Member's** premises, by strikers or other persons, with rebuilding, repairing, or replacing the property damaged or destroyed, or with the resumption or continuation of business, or with the reoccupancy of the premises; nor for any loss occurring to property in transit off premises.

(3) **Damage to Non-Owned Property**

This **Agreement**, subject to all provisions and without increasing the amount of said **Agreement**, also covers loss resulting from damage to or destruction by the perils covered of:

(a) Electrical, steam, gas, water, telephone, and other transmission lines and related plants, substations, and equipment which are not owned by the **Member** and are situated on or within one statute mile of the insured premises;

(b) Dams, reservoirs, or equipment connected therewith which are not owned by the **Member** when water, used as a raw material or used for power or for other manufacturing purposes, stored behind such dams or reservoirs is released from storage and causes an interruption of business as a result of lack of water supply from such sources. The **Fund's** liability shall not exceed 30 consecutive days after such length of time as would be required with the exercise of due diligence and dispatch to repair or replace the damaged or destroyed dam, reservoir, or equipment.

(4) **Interruption by Civil or Military Authority**

This **Agreement** is extended to cover the loss sustained during the period of time (not exceeding two weeks) when, as a direct result of a covered peril,

P300
10-1-09

VOL 0 0 1 PAGE 0 0 9 2

access to real and personal property is prohibited by order of civil or military authority.

#### (5) Ingress/Egress

This **Agreement** is extended to cover the loss sustained during the period of time (not exceeding two weeks) when, as a direct result of a peril covered, ingress to or egress from the **Member's** premises is thereby prevented.

### 5. Personal Property of Employees and Officials

This **Agreement** covers personal property of the **Member's** officials, employees, and volunteers while used or intended for use on behalf of the **Member**, provided values are reported.

### 6. Leasehold Interest

This **Agreement** covers:

a. Pro rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the **Member's** interest in:

(1) Improvements and betterments to real property during the unexpired term of the lease which is not covered under any other section of this **Agreement**;

(2) The amount of advance rental paid by the **Member** and not recoverable under the terms of the lease for the unexpired term of the lease;

when property is rendered wholly or partially untenantable by any of the perils covered herein during the term of **Member's Agreement** and the lease is cancelled by the lessor in accordance with the conditions of the lease or by statutory requirements of the state in which the damaged or destroyed property is located; and

#### b. Member's Interest as Lessee

(1) This **Agreement** covers the **Member's interest as lessee** when property is rendered wholly or partially untenantable by any of the perils covered herein during the term of this **Agreement** and the lease is cancelled by the lessor in accordance with the conditions of the lease or by statutory requirements of the state in which the damaged or destroyed property is located.

(2) **Member's interest as lessee** as referred to herein shall be paid for the first three months succeeding the date of the loss, and the **net lease interest** shall be paid for the remaining months of the unexpired lease.

#### c. Definitions:

The following terms, wherever used in this section, shall mean as follows:

(1) **Member's interest as lessee** is defined as:

(a) The excess of the rental value of similar premises over the actual rental payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease;

(b) The rental income which would have been earned by the **Member** from sublease agreements, to the extent not covered under any other section of this **Agreement**, over and above the rental expenses specified in the lease between the **Member** and the lessor.

(2) **Net lease interest** is defined as that sum which, placed at 8% interest compounded annually, will be equivalent to the "**Member's interest as lessee.**"

d. The **Fund** shall not be liable for any increase of loss which may be occasioned by the suspension, lapse, or cancellation of any license or by the exercising of an option to cancel the lease.

### 7. Outdoor Trees and Shrubs

This **Agreement** covers loss, damage, and debris removal expenses to outdoor trees, shrubs, and plants located within 100 feet of a structure listed on the Property Schedule attached to the declarations when there is a concurrent covered loss or damage to said structure. The maximum amount that will be paid for any one loss, disaster, or casualty under this extension of coverage for outdoor trees and shrubs is $10,000, with the further condition that the maximum amount that will be paid on any one tree, shrub, or plant shall be $250.

8. **Pollutant Clean Up and Removal**

The **Fund** will pay expenses to extract pollutants ("pollutants" being defined as set forth in paragraph F of the General Exclusions) from land or water at premises identified in the Property Schedule attached to the **declarations** or covered under Section III.C.1. as newly acquired property, provided the release, discharge, dispersal, seepage, or migration of the pollutants is caused by or results from a peril covered herein that occurs during the **Agreement** period. The expenses will be paid only if they are reported in writing within 180 days of the date of the release, discharge, dispersal, seepage, or migration of the pollutants.

The maximum amount that will be paid during any one **Fund Year** under this extension of coverage is $20,000 at each premises covered under this section.

D. **Transit**

1. This **Agreement** attaches and covers shipments within and between the territorial limits of this **Agreement**, including the coastal waters thereof, by any means of conveyance, from the time the property is moved for purpose of loading and continuously thereafter while awaiting and during loading and unloading and in temporary storage, including temporary storage on any conveyance intended for use for any outbound or used for inbound shipment, including during deviation and delay, until safely delivered into place of final destination.

2. This **Agreement** is extended to cover loss or damage to property:

   a. Sold and shipped by the **Member** under terms of F.O.B. point of origin or other terms usually regarded as terminating the shipper's responsibility short of points of delivery;

   b. Arising out of any unauthorized person(s) representing themselves to be the proper party(ies) to receive goods for shipment or to accept goods for delivery;

   c. Occasioned by the acceptance by the **Member**, by its agents, or by its customers, of fraudulent bills of lading, shipping and delivery orders, or similar documents.

3. a. The **Member** may waive right(s) of recovery against private and contract carriers and accept bills of lading or receipts from carriers, bailees, warehousemen, or processors limiting their liability, but this transit coverage shall not inure to the benefit of any carrier, bailee, warehouseman, or processor.

   b. With respect to shipments made under F.O.B. or similar terms, the **Fund** agrees to waive its rights of subrogation against consignees at the option of the **Member**.

IV. **VALUATION – Actual Cash Value**

In the case of loss the basis of adjustment shall be as follows:

A. Buildings, machinery, equipment, furniture, fixtures, improvements, and betterments: the **actual cash value** of the property covered at the time of loss. In the event of loss or damage to improvements and betterments, the **Fund** agrees to accept and consider the **Member** as the sole and unconditional owner.

B. Exhibitions, displays, fine arts, and historical structures: the cost to repair or the scheduled value, whichever is less.

C. Household goods and personal effects: **actual cash value** of the property covered at the time of loss.

D. **Valuable papers and records**: the cost to repair or replace the property with other of like kind and quality including the cost of gathering or assembling information or, if not so replaced, the cost of the property in blank or unused form.

E. Property of others: **replacement cost** or the **Member's** legal liability, whichever is less.

F. Other property not otherwise provided for: at the **actual cash value** of the property at the time and place of loss.

G. When the full cost of repair or replacement in any one occurrence is the lesser of $25,000 or 10% of the real and personal property limit of coverage, this **Agreement** is extended to cover the full cost of repair or replacement, without deduction for depreciation. The **Fund** shall not be liable under this paragraph unless and until the damaged property is actually repaired or replaced.

V. **ADDITIONAL COVERAGES**

A. **Fire Department Service Charge**

If the fire department is called to save or protect property from a peril covered, or because the property is destroyed or damaged by a peril covered, the **Fund** shall pay for the **Member's** liability for fire department service charges:

1. Assumed by contract or agreement prior to loss; or

2. Required by local ordinance.

No deductible applies to this coverage.

## B. Debris Removal

This **Agreement** covers the following expenses resulting from damage to property covered hereunder which is caused by or results from a peril covered hereunder:

1. The cost of removal of debris of property covered hereunder; and

2. The cost of removal of debris of property not covered hereunder from the premises of the **Member**.

Coverage for debris removal does not apply to costs to:

1. Extract pollutants ("pollutants" being defined as set forth in paragraph F of the General Exclusions) from land or water; or

2. Remove, restore, or replace polluted land or water.

## C. Demolition and Increased Cost of Construction

In the event of loss or damage under this **Agreement** that invokes the enforcement of any law or ordinance regulating the construction or repair of damaged facilities, the **Fund** shall be liable for:

1. The cost of demolishing the undamaged facility including the cost of clearing the site;

2. The proportion that the value of the undamaged part of the facility bore to the value of the entire facility prior to loss;

3. Increased cost of repair or reconstruction of the damaged and undamaged facility on the same or another site and limited to the minimum requirements of such laws or ordinances regulating the repair or reconstruction of the damaged property on the same site; however, the **Fund** shall not be liable for any increased cost of construction loss unless the damaged facility is actually rebuilt or replaced;

4. Any increase in the loss of revenue, extra expense, and rental value loss arising out of the additional time required to comply with said law or ordinance.

## D. Expediting Expense

This **Agreement** covers the reasonable extra cost of temporary repair and of expediting the repair of damaged property covered hereunder, including overtime and express freight or other rapid means of transportation.

## E. Consequential Loss

This **Agreement** covers consequential loss to the property described caused by change of temperature or humidity or by interruption of power, heat, air conditioning, or refrigeration as a result of damage to property covered hereunder or property of others within one statute mile of the covered premises.

## F. Terrorism

This **Agreement** covers loss or damage caused by or resulting from acts of **terrorism** limited to the lesser of $10,000,000 or the Real and Personal Property Limit of Coverage shown on the **declarations** applicable to any one occurrence.

# NAMED PERIL COVERAGE OPTION

With respect to property on which the **Agreement Declarations** specifies "Named Peril," the Special Form Coverages Sections I and II are deleted and replaced by the following:

## PERILS INSURED

This **Agreement** covers physical loss of or damage to property described herein occuring within the **territory**, including salvage and all other charges on shipments covered hereunder as a result of the following perils:

**A. Fire**

**B. Lightning**

**C. Windstorm or Hail**

1. The Fund will not be liable for loss caused directly or indirectly by frost or cold weather or ice (other than hail), snow, or sleet, whether driven by wind or not.

2. The Fund will not be liable for loss to the interior of the buildings or the property covered therein caused by rain, snow, sand, or dust, whether driven by wind or not, unless the buildings covered shall first sustain an actual damage to roof or walls by the direct action of wind or hail, and then shall be liable for loss to the interior of the buildings or the property covered therein as may be caused by rain, snow, sand, or dust entering the buildings through openings in the roof or walls caused by direct action of wind or hail.

**D. Explosion**

Loss by explosion shall include direct loss resulting from the explosion of accumulated gases or unconsumed fuel within the fire box (or combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom. The Fund will not be liable for loss by explosion of steam boilers, steam pipes, steam turbines, or steam engines, if owned by, leased by, or operated under the control of the **Member**. The following are not explosions within the intent or meaning of these provisions:

1. Shock waves caused by aircraft, generally known as "sonic boom;"

2. Electric arcing;

3. Rupture or bursting of rotating or moving parts of machinery caused by centrifugal force or mechanical breakdown;

4. Water hammer;

5. Rupture or bursting of water pipes;

6. Rupture or bursting due to expansion or swelling of the contents of any building or structure, caused by or resulting from water; or

7. Rupture, bursting, or operation of pressure relief devices.

**E. Sudden and Accidental Damage from Smoke,** other than smoke from agricultural smudging or industrial operations.

**F. Vehicles or Aircraft**

Loss by aircraft shall include direct loss by falling aircraft or objects falling there from, but the Fund shall not be liable for loss by any vehicle or aircraft (except falling aircraft) owned or operated by the **Member**.

**G. Riot, Riot Attending a Strike, or Civil Commotion**

Loss by riot, riot attending a strike, or civil commotion shall include direct loss by acts of striking employees of the owner or occupants of the buildings while occupied by said striking employees and shall also include under this peril direct loss from pillage and looting occurring during and at the immediate place of a riot, riot attending a strike, or civil commotion. The Fund shall not be liable with respect to this peril for loss resulting from damage to or destruction of the property because of change in temperature or humidity or interruption of operations, whether or not such loss is covered by this **Agreement** as to other perils.

**H. Vandalism or Malicious Mischief**

Loss by vandalism or malicious mischief shall mean only the willful and malicious damage to or destruction of the property covered, including direct structural damage to the buildings covered hereunder resulting from burglary; provided, however, such damage resulting from burglary shall not include, nor shall the Fund be liable for, the value or replacement of any property, real or personal, including fixtures and/or contents of the insured buildings which are wrongfully and unlawfully removed from the premises. The Fund shall not be liable, with respect to these perils, for any loss:

1. To glass (other than building blocks constituting a part of the building);

2. By explosion, rupture, or bursting of steam boilers,

P300
10-1-09

VOL 0 0 1 PAGE 0 0 9 6

steam pipes, steam turbines, steam engines, or rotating parts of machines or machinery owned, operated, or controlled by the **Member**;

3. Caused by or resulting from power, heating, or cooling failure unless such failure results from physical damage to power, heating, or cooling equipment situated on premises where the property covered is located.

I. **Sprinkler Leakage**

Direct loss by the leaking or discharge of water or other substance from within any automatic sprinkler system including the cost of repairs and replacement of the automatic sprinkler system when the damage sustained is caused directly by:

1. Breakage of any of its parts resulting in sprinkler leakage; or

2. Direct loss caused by collapse or fall of a tank forming a part of such system.

Automatic fire protection system includes sprinklers, discharge nozzles and ducts, pipes, valves, fittings, tanks (including component parts and supports thereof), pumps, and private fire projection mains, all connected with and constituting a part of an automatic fire protection system; and non-automatic fire protective systems, hydrants, standpipes, or outlets supplied from an automatic fire protection system.

J. If a limit and deductible are stated in the **declarations** for the perils of **flood** and **earthquake**, the following perils are covered:

1. **Flood**, as provided under the Flood Coverage Option; and

2. **Earthquake.**

P300
10-1-09

# *FLOOD COVERAGE OPTION*

If a limit is shown on the **declarations** for flood:

I.  Exclusion M. of the Special Form Property Coverage portion of this Property Coverage Document is deleted with respect to all locations listed on the Property Schedule attached to the **declarations**. Coverage is extended to cover risk of direct physical loss of or damage to covered property, as described under III.A. of Special Form Property Coverage, by those causes listed under exclusion M., hereinafter referred to collectively as "flood."

II.  If any flood occurs within a period of the continued rising or overflow of any surface waters or if any flood results from any tidal wave or series of tidal waves caused by one disturbance, such flood shall be deemed to be a single occurrence within the meaning of the **Agreement**. However, the **Fund** will be liable for any losses occurring for a period of up to 72 hours after the expiration of the **Agreement** provided that the first flood damage occurred prior to the date and time that such coverage expired.

III.  **LIMITATIONS, EXCLUSIONS, AND RELATED PROVISIONS**

A.  Coverage under this option does not apply to tidal flooding to the following property, unless reported prior to a loss and a flood contribution charged:

1.  Bulkheads, pilings, piers, wharves, docks;

2.  Retaining walls that are not part of a building;

3.  Structures located on or over a body of water, and any property in or on such structures; or

4.  Any property that is determined to be in Flood Zone "V" at the time of loss.

The **Fund** shall not be liable for more than the value shown for such property on the Real and Personal Property Schedule.  Such coverage is excess of the amount of coverage available under a National Flood Insurance Program policy, whether or not such policy is in effect at the time of loss.

B.  With respect to property located within the boundaries of counties directly adjacent to the Gulf of Mexico and within the 100-year flood plain "A" zones at the time of loss, the following additional conditions and sublimits apply:

1.  For buildings and/or contents of buildings with actual cash value in excess of the maximum amounts of coverage available through the National Flood Insurance Program, coverage shall be excess of such maximum amounts.

2.  For buildings and/or contents of buildings covered under a National Flood Insurance Program policy, the **Fund** will reimburse the **Member** the difference between the **actual cash value** and **replacement cost** value of the loss, provided the **Member** elected the Replacement Cost Option as indicated on the **declarations**.

The above provisions do not apply to:

a. Property that is not eligible for coverage through the National Flood Insurance Program;

b. Coverage Extensions for **Loss of Revenue, Extra Expense, Valuable Papers and Records,** Accounts Receivable, or Outdoor Trees and Shrubs; or

c. Fine Arts.

3.  The **Fund** shall not be liable for more than $1,500,000 for loss or damage in a single occurrence and within the 12-month coverage period beginning with the effective date shown on the **declarations**.

C.  All conditions and sublimits under B. above apply to property located within the boundaries of Harris, Orange, and Jackson counties, but only as respects loss or damage caused by tidal waters.

IV.  **DEDUCTIBLE**

Loss under this coverage is subject to the flood deductible shown on the **declarations** which shall be deducted from the sum of all loss or damage arising out of any one occurrence. The deductible shall be reduced by amounts recoverable from a National Flood Insurance Program policy and any deductible under that policy.

# BOILER & MACHINERY COVERAGE OPTION

With respect to property on which the **Agreement Declarations** specifies "Boiler & Machinery" coverage:

I.  A. Coverage is extended to cover direct damage to property covered under this Property Coverage Document caused by an **accident** to an **object**.

   B. In regards to Boiler & Machinery coverage, the following exclusions of the Special Form Property Coverage portion of this Property Coverage Document are deleted with respect to all **objects** found at locations listed on the Real and Personal Property Schedule attached to the **declarations**.

   I. Electrical injury or disturbance to electrical appliances, devices, or wiring caused by electrical currents artificially generated unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

   J. Mechanical breakdown unless loss or damage from a peril covered herein ensues and then this **Agreement** shall cover only for such ensuing loss or damage.

   K. Explosion, rupture, or bursting of steam boilers, steam pipes, steam turbines, or steam engines owned or operated by the **Member** unless loss or damage from a peril covered herein ensues, and then this **Agreement** shall cover only for such ensuing loss or damage.

   C. Upon the discovery of a dangerous condition with respect to any **object**, any representative of the **Fund** may immediately suspend this addendum with respect to an **accident** to said **object** by written notice mailed to the **Member's** designee named in the **declarations**. Coverage so suspended may be reinstated by the Fund but only by an endorsement issued to form a part of this **Agreement**.

## II. ADDITIONAL DEFINITIONS

When used in this Boiler & Machinery coverage:

   A. **Accident** means a sudden and accidental breakdown of an **object** or a part thereof which manifests itself at the time of its occurrence by physical damage to the **object** that necessitates repair or replacement of the **object** or part thereof.

   1. **Accident** does not include any of the following:

   a. Wear and tear, depletion, corrosion, erosion, or deterioration;

   b. The leaking of any joint, connection, fitting, valve, seal, or packing;

   c. The breakdown of any structure or foundation which supports, encloses, or covers an object; or

   d. The normal or intended functioning of any safety or protective device.

   B. **Object**

   1. **Object** means any boiler, any fired or unfired pressure vessel, refrigeration or air conditioning system, any piping and its accessory equipment, any mechanical or electrical machine or apparatus used for the generation, transmission, or utilization of mechanical or electrical power, including compressors, pumps, engines, turbines, motors, generators, gears, sets of gears, fans, blowers; including couplers, clutches, wheels, or bearings on a shaft that constitute a part of an **object**; transformers, or electrical distribution equipment.

   2. **Object** does not mean any of the following:

   a. Stove, oven, kiln, furnace, motor vehicle or **mobile equipment**, elevator, escalator, or conveyor;

   b. Any structure or foundation which supports, encloses, or covers an **object**;

   c. Computer or data processing equipment unless used solely to operate or control an **object** as defined in this coverage;

   d. Water, sewer, or gas piping, or sprinkler systems;

   e. Equipment used for communication, lighting, advertising, display, research, diagnostic, therapeutic, surgical, dental, or pathological purposes; or

   f. Mechanical or electrical machine or apparatus used for the generation of electrical power for sale to the public.

# REPLACEMENT COST OPTION

With respect to property on which the Agreement Declarations specifies "Replacement Cost," the "Valuation – Actual Cash Value" Section IV is deleted and replaced by the following:

## IV. REPLACEMENT VALUE

In case of loss, the basis of adjustment shall be as follows:

A. On buildings, machinery, equipment, furniture, fixtures, improvements, and betterments: replacement cost. In the event of loss or damage to improvements and betterments, the **Fund** agrees to accept and consider the **Member** as the sole and unconditional owner. Notwithstanding the above, **actual cash value** only shall apply to the following buildings and structures:

   1. Buildings or portions thereof which, as a result of decay, deterioration, or dilapidation, are reasonably likely to fully or partially collapse, or which cannot be expected to withstand reasonably anticipated storms; or

   2. Buildings that have become deteriorated through accident, lack of repair, or natural causes, or by damage through exposure to the elements or damage through fire, to the extent that the building is no longer reasonably protected from the weather or from future damage that may be caused by a covered peril.

B. Exhibitions, displays, fine arts, and historical structures: the cost to repair or the scheduled value, whichever is less.

C. Household goods and personal effects: replacement cost.

D. **Valuable papers and records:** the cost to repair or replace the property with other of like kind and quality, including the cost of gathering and/or assembling information or, if not so replaced, the cost of the property in blank or unused form.

E. On property of others: **replacement cost** or the **Member's** legal liability, whichever is less.

F. Other property not otherwise provided for: **replacement cost.**

G. **Mobile Equipment: replacement cost,** but not exceeding the last value reported for the item replaced.

H. The **Member** may make a claim for loss or damage covered by this coverage on an **actual cash value basis** instead of on a **replacement cost basis.** In the event the **Member** elects to have loss or damage settled on an **actual cash value basis,** the **Member** may still make a claim for the additional coverage this optional coverage provides if the **Member** notifies the **Fund** of its intent to do so within 180 days after the loss or damage.

I. The **Fund** will pay on an **actual cash value basis** for any loss or damage until the loss or damaged property is actually repaired or replaced. The **Fund** will only pay **replacement cost** if the repairs or replacements are made as soon as reasonably possible after the loss or damage, but in no event will the **Fund** pay on a **replacement cost** basis for property not repaired or replaced within two years of the loss unless an extension is granted during such two year period, in writing, by the **Fund.**

VOL 0 0 1 PAGE 0 1 0 0

# ELECTRONIC DATA PROCESSING EQUIPMENT COVERAGE OPTION

With respect to property on which the **Agreement Declarations** specify "Data Processing Equipment" coverage, the "Special Form Property Coverage" applies to all **electronic data processing equipment.** Additionally, Exclusions I, J, K, and M of that coverage section do not apply to any **electronic data processing equipment.**

P300
10-1-09

VOL 0 0 1 PAGE 0 1 0 1

# *MOBILE EQUIPMENT COVERAGE OPTION*

With respect to **mobile equipment** on which the **Agreement Declarations** specify **mobile equipment** coverage, Paragraph 6 of Section III. B. of the "Special Form Property Coverage" is amended to read as follows:

6. Watercraft (except rowboats and canoes), aircraft, **automobiles;** but this exclusion shall not apply to contractors' equipment, **mobile equipment, commandeered mobile equipment,** or **commandeered boats.**

The following definitions shall apply to this Mobile Equipment Coverage Option:

a. **Commandeered mobile equipment** means **mobile equipment** or a boat that the **Member** seizes, confiscates, or takes arbitrarily by force into the **Member's** temporary care, custody, or control while using it as part of an **emergency situation. Commandeered mobile equipment** or boat does not include **mobile equipment** or a boat owned or available to an employee or volunteer of the **Member** from whom the **Member** has tacit approval to use the **mobile equipment** or boat.

b. **Emergency situation** means an unexpected situation demanding immediate official action.

Exclusions M and O of Part II of the "Special Form Property Coverage" do not apply to **mobile equipment.**



# CRIME COVERAGE OPTION

With respect to property on which the **Agreement Declarations** specifies "Public Employee Dishonesty Coverage," "Theft, Disappearance, and Destruction Coverage," "Forgery or Alteration Coverage," or "Computer Fraud Coverage":

## I.  GENERAL

In addition to the General Definitions, General Exclusions, and General Conditions contained in this Property Coverage Document, the following General Definitions, General Exclusions, and General Conditions apply to: (i) the Public Employee Dishonesty Coverage; (ii) the Theft, Disappearance, and Destruction Coverage; (iii) the Forgery or Alteration Coverage; and (iv) Computer Fraud Coverage.

### A. GENERAL DEFINITIONS

1. **EMPLOYEE** means:

   a. Any person:

      (1) While in the **Member's** service (and for 30 days after termination of service); and

      (2) Whom the **Member** has the right to direct and control while performing services for the **Member.**

   b. But **employee** does not mean any:

      (1) Agent, broker, factor, commission merchant, consignee, independent contractor, or representative of the same general character;

      (2) Elected officials, except while performing acts coming within the scope of the usual duties of their office;

      (3) Appointed officials, except while performing acts coming within the scope of the usual duties of an **employee;** or

      (4) Persons required by law to be bonded.

2. **MONEY** means:

   a. Currency, coins, and bank notes in current use and having a face value; and

   b. Travelers checks, register checks, and money orders held for sale to the public.

3. **PROPERTY OTHER THAN MONEY AND SECURITIES** means any tangible property other than **money** and **securities** that has intrinsic value.

4. **SECURITIES** means negotiable and nonnegotiable instruments or contracts representing either **money** or other property and includes:

   a. Tokens, tickets, revenue, and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

   b. Evidences of debt issued in connection with credit or charge cards, which cards are not issued by the **Member;**

   but does not include **money.**

### B. GENERAL EXCLUSIONS

The **Fund** will not pay for loss as specified below:

1. **Indirect Loss:** Loss that is an indirect result of any act or occurrence covered by this coverage including, but not limited to, loss resulting from:

   a. The **Member's** inability to realize income that the **Member** would have realized had there been no loss of, or loss from damage to, covered property;

   b. Payment of damages of any type for which the **Member** is legally liable. But, the **Fund** will pay compensatory damages arising directly from a loss covered under this coverage; or

   c. Payment of costs, fees, or other expenses the **Member** incurs in establishing either the existence or the amount of loss under this coverage.

2. **Legal Expenses:** Expenses related to any legal action.

### C. GENERAL CONDITIONS

1. **Loss Sustained During Prior Insurance**

   a. If the **Member,** or any predecessor in interest, sustained loss during the period of any prior insurance that the **Member** or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, the **Fund** will pay for it under this coverage provided:

      (1) This coverage became effective at the time of cancellation or termination of the prior insurance; and

P300
10-1-09

(2) The loss would have been covered by this coverage had it been in effect when the acts or events causing the loss were committed or occurred.

b. The coverage under this Condition is part of, not in addition to, the limits of liability applying to this coverage and is limited to the lesser of the amount recoverable under:

(1) This coverage as of its effective date; or

(2) The prior insurance had it remained in effect.

2. **Loss Covered Under This Coverage and Prior Coverage Issued by the Fund:** If any loss is covered:

a. Partly by this coverage; and

b. Partly by any prior canceled or terminated coverage that the **Fund** had issued to the **Member** or any predecessor in interest;

the most the **Fund** will pay is the larger of the amount recoverable under this coverage or the prior coverage.

3. **Non-Cumulation of Limit of Liability:** Regardless of the number of years this coverage remains in force or the number of contributions paid, no limit of liability cumulates from year to year or period to period.

4. **Ownership of Property; Interests Covered:** The property covered under this coverage is limited to property:

a. That the **Member** owns or holds; or

b. For which the **Member** is legally liable.

However, this coverage is for the **Member's** benefit only. It provides no rights or benefits to any other person or organization.

5. **Records:** The **Member** must keep record of all covered property so the **Fund** can verify the amount of any loss.

6. **Valuation – Settlement**

a. Subject to the applicable limit of liability provision, the **Fund** will pay for:

(1) Loss of **money** but only up to and including its face value. The **Fund** may, at its option, pay for loss of **money** issued by any country other than the United States of America:

(a) At face value in the **money** issued by that country; or

(b) In the United States of America dollar equivalent determined by the rate of exchange on the day the loss was discovered.

(2) Loss of **securities** but only up to and including their value at the close of business on the day the loss was discovered. The **Fund** may, at its option:

(a) Pay the value of such securities or replace them in kind, in which event the **Member** must assign to the **Fund** all of the **Member's** rights, title, and interest in and to those **securities;**

(b) Pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **securities.** However, the **Fund** will be liable only for the payment of so much of the cost of the bond as would be charged for a bond having a penalty not exceeding the lesser of the:

i. Value of the **securities** at the close of business on the day the loss was discovered; or

ii. Limit of liability.

(3) Loss of, or loss from damage to, **property other than money and securities** or loss from damage to the premises for not more than the:

(a) Actual cash value of the property on the day the loss was discovered;

(b) Cost of repairing the property or premises; or

(c) Cost of replacing the property with property of like kind and quality.

The **Fund** may, at its option, pay the **actual cash value** of the property, repair it, or replace it.

b. The **Fund** may, at its option, pay for loss of, or loss from damage to, property other than **money:**

(1) In the **money** of the country in which the loss occurred; or

(2) In the United States of America dollar equivalent of the money of the country in which the loss occurred determined by the rate of exchange on the day the loss was discovered.

c. Any property that the **Fund** pays for or replaces becomes the **Fund's** property.

7. **Discovery Period for Loss:** The **Fund** will pay only for covered loss discovered no later than one year from the end of the coverage period.

8. **Assignment:** Assignment of interest under the **Agreement** shall not bind the **Fund** until its consent is endorsed thereon.

9. **Territory:** This **Agreement** covers only acts committed or events occurring within the United States of America, U.S. Virgin Islands, Puerto Rico, Canal Zones, or Canada.

## II. PUBLIC EMPLOYEE DISHONESTY COVERAGE

### A. COVERAGE

The **Fund** will pay for loss of, and loss from damage to, covered property resulting directly from the Covered Cause of Loss.

1. **Covered Property: Money, securities, and property other than money and securities.**

2. **Covered Causes of Loss: Employee dishonesty.**

3. **Coverage Extension**

   **Employees** Temporarily Outside Coverage Territory: The **Fund** will pay for loss caused by any **employee** while temporarily outside the territory specified in the General Conditions for a period not more than 90 days.

### B. LIMIT OF LIABILITY

If a per **occurrence** limit is shown in the **declarations,** the **Fund** will not be liable for more than the indicated limit for loss in any one **occurrence.** If a per **employee** limit is shown, the **Fund** will not be liable for more than the indicated limit for loss resulting from an act or series of acts by any one **employee.**

### C. ADDITIONAL EXCLUSIONS, CONDITIONS, AND DEFINITIONS

In addition to the General Definitions, General Exclusions, and General Conditions contained in this Property Coverage Document and the Crime

Coverage Option, Public Employee Dishonesty Coverage is subject to the following:

1. **Additional Exclusions:** The **Fund** will not pay for loss or damages as specified below:

   a. <u>**Employee** Canceled Under Prior Insurance</u>: Loss caused by any **employee** for whom similar prior insurance has been canceled and not reinstated since the last such cancellation.

   b. <u>Inventory Shortages</u>: Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

      (1) An inventory computation; or

      (2) A profit and loss computation.

   c. <u>**Bonded Employee**</u>: Loss caused by any **employee** required by law to be individually bonded.

   d. <u>Damages</u>: Damages for which the **Member** is legally liable as a result of:

      (1) The deprivation or violation of the civil rights of any person by an **employee;** or

      (2) The tortious conduct of any **employee,** except conversion of property of other parties held by the **Member** in any capacity.

   e. <u>Depository Failure</u>: Loss resulting from the failure of any entity acting as a depository for the **Member's** property or property for which the **Member** is responsible.

2. **Additional Conditions:**

   a. <u>Cancellation As To Any **Employee**</u>: This coverage is canceled as to any **employee:**

      (1) Immediately upon discovery by the **Member** or any official or **employee** authorized to manage, govern, or control the **Member's employees** of any act on the part of an **employee** whether before or after becoming employed by the **Member** which would constitute a loss covered under the terms of this Public Employee Dishonesty Coverage; or

      (2) On the date specified in a notice mailed to the **Member.** That date will be at least 30 days after the date of mailing.

P300
10-1-09

VOL 0 0 1 PAGE 0 1 0 5

The mailing of notice to the **Member** at the last mailing address known to the **Fund** will be sufficient proof of notice. Delivery of notice is the same as mailing.

b. Sole Benefit: This coverage is for the **Member's** sole benefit. No legal proceeding of any kind to recover on account of loss under this coverage may be brought by anyone other than the **Member**.

3. **Additional Definitions:**

a. **Employee Dishonesty** In Paragraph A.2. of Section II of this Crime Coverage Option means any dishonest act committed by an **employee**, whether identified or not, acting alone or in collusion with other persons, with the manifest intent to:

(1) Cause the **Member** to sustain loss; and also

(2) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment) for:

(a) The **employee**; or

(b) Any person or organization intended by the **employee** to receive that benefit.

b. **Occurrence** means all loss caused by, or involving, one or more **employees**, whether the result of a single act or series of acts.

## III. THEFT, DISAPPEARANCE, AND DESTRUCTION COVERAGE

### A. COVERAGE

The **Fund** will pay for loss of covered property resulting directly from the covered causes of loss.

1. **Inside The Premises:**

a. Covered Property: **Money** and **securities** inside the **premises** or a banking **premises**.

b. Covered Causes of Loss:

(1) **Theft**;

(2) Disappearance; and

(3) Destruction.

c. Covered Extensions:

(1) Containers of Covered Property: The **Fund** will pay for loss of, and loss from damage to, a locked safe, vault, cash register, cash box, or cash drawer located in the **premises** resulting directly from an actual or attempted **theft** of or unlawful entry into those containers; and

(2) **Premises** Damage: The **Fund** will pay for loss from damage to the **premises** or its exterior resulting directly from an actual or attempted **theft** of covered property if the **Member** is the owner of the **premises** or is liable for damage to it.

2. **Outside the Premises:**

a. Covered Property: **Money** and **securities** outside the **premises** in the care and custody of a **messenger**.

b. Covered Causes of Loss:

(1) **Theft**;

(2) Disappearance; and

(3) Destruction.

c. Coverage Extension:

Conveyance of Property By Armored Motor Vehicle Company: The **Fund** will pay for loss of covered property resulting directly from the covered causes of loss while outside the **premises** in the care and custody of an armored motor vehicle company.

But the **Fund** will pay only for the amount of loss that the **Member** cannot recover:

(1) Under the **Member's** contract with the armored motor vehicle company; and

(2) From any insurance or indemnity carried by, or for the benefit of customers of, the armored motor vehicle company.

### B. LIMIT OF LIABILITY

The most the **Fund** will pay for loss in any one occurrence is $5,000, unless otherwise shown in the **declarations**.

### C. ADDITIONAL EXCLUSIONS, CONDITIONS, AND DEFINITIONS

In addition to the General Definitions, General Exclusions, and General Conditions contained in this Property Coverage Document and the Crime

Coverage Option, this Theft, Disappearance, and Destruction Coverage is subject to the following:

1. **Additional Exclusions:** The **Fund** will not pay for loss as specified below:

   a. Accounting or Arithmetical Errors or Omissions: Loss resulting from accounting or arithmetical errors or omissions.

   b. Acts of Employees, Elected or Appointed Officials, or Representatives: Loss resulting from any dishonest or criminal act committed by any of the **Member's employees**, elected or appointed officials, or authorized representatives:

      (1) Acting alone or in collusion with other persons; or

      (2) While performing services for the **Member** or otherwise.

   c. Exchanges or Purchases: Loss resulting from the giving or surrendering of property in any exchange or purchase.

   d. Fire: Loss from damage to the **premises** resulting from fire, however caused.

   e. Money Operated Devices: Loss of property contained in any **money** operated device unless the amount of **money** deposited in it is recorded by a continuous recording instrument in the device.

   f. Transfer or Surrender of Property:

      (1) Loss of property after it has been transferred or surrendered to a person or place outside the **premises** or **banking premises**:

         (a) On the basis of unauthorized instructions; or

         (b) As a result of a threat to do bodily harm to any person or damage to any property.

      (2) This Exclusion does not apply under Paragraph A.2. of Section III of this Crime Coverage Option to loss of covered property while outside the **premises or banking premises** in the care and custody of a **messenger** if the **Member**:

         (a) Had no knowledge of any threat at the time the conveyance began; or

         (b) Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

   g. Vandalism: Loss from damage to the **premises** or its exterior or to containers of covered property by vandalism or malicious mischief.

   h. Voluntary Parting of Title to or Possession of Property: Loss resulting from the **Member's**, or anyone acting on the **Member's** express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

2. **Additional Condition:**

   Duties in the Event of Loss: If the **Member** has reason to believe that any loss of, or loss from damage to, covered property involves a violation of law, the **Member** must notify the police.

3. **Additional Definitions:**

   a. **Banking Premises** means the interior of that portion of any building occupied by a banking institution or similar safe depository.

   b. **Messenger** means the **Member**, any of the **Member's** officials, or any **employee** while having care and custody of the property outside the **premises**.

   c. **Occurrence** means an:

      (1) Act or series of related acts involving one or more persons; or

      (2) Act or event, or a series of related acts or events not involving any person.

   d. **Premises** means the interior of that portion of any building the **Member** occupies in conducting the **Member's** business.

   e. **Theft** means any act of stealing.

## IV. FORGERY OR ALTERATION COVERAGE

### A. COVERAGE

The **Fund** will pay for loss involving covered instruments resulting directly from the covered causes of loss.

1. **Covered Instruments:** Checks, drafts, promissory notes, or similar written promises, orders, or directions to pay a sum certain in **money** that are:

a. Made or drawn by or drawn upon the **Member**;

b. Made or drawn by one acting as the **Member's** agent;

or that are purported to have been so made or drawn.

2. **Covered Causes of Loss:** Forgery or alteration of, on, or in any covered instrument.

3. **Coverage Extension:**

Legal Expenses: If the **Member** is sued for refusing to pay any covered instrument on the basis that it has been forged or altered, and the **Member** has the **Fund's** written consent to defend against the suit, the **Fund** will pay for any reasonable legal expenses that the **Member** incurs and pays in that defense. The amount the Fund will pay under this extension is in addition to the limit of liability applicable to this coverage.

B. **ADDITIONAL EXCLUSIONS, CONDITIONS, AND DEFINITIONS:**

In addition to the General Definitions, General Exclusions, and General Conditions contained in this Property Coverage Document and the Crime Coverage Option, this Forgery or Alteration Coverage is also subject to the following:

1. **Additional Exclusion:**

Acts of Employees, Elected, or Appointed Officials: The Fund will not pay for loss resulting from any dishonest or criminal act committed by any of the **Member's** employees, directors, or trustees:

a. Acting alone or in collusion with other persons; or

b. While performing services for the **Member** or otherwise.

2. **Additional Conditions:**

a. Facsimile Signatures: The Fund will treat mechanically reproduced facsimile signatures the same as handwritten signatures.

b. General Amendments: As respects this Forgery or Alteration Coverage, the words "covered property" or "property covered" in the General Conditions of the Crime Coverage Option mean covered instruments.

c. Proof of Loss: The **Member** must include with the **Member's** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

d. Territory: The **Fund** will cover loss the **Member** sustains anywhere in the world.

3. **Additional Definition:**

**Occurrence** means all loss caused by any person or in which that person is involved, whether the loss involves one or more instruments.

V. **COMPUTER FRAUD COVERAGE**

A. **COVERAGE**

The **Fund** will pay for the loss of and loss from damage to **money** and **securities** and **property other than money and securities** resulting directly from **computer fraud**.

B. **LIMIT**

The most the **Fund** will pay for loss in any one **occurrence** is the applicable limit shown in the **Agreement Declarations**.

C. **DEDUCTIBLE**

The **Fund** will not pay for loss in any one **occurrence** unless the amount of loss exceeds the deductible amount shown on the **Agreement Declarations**. The **Fund** will then pay the amount of loss in excess of the deductible amount, up to the limit. In the event more than one deductible amount could apply to the loss, only the highest deductible amount may be applied.

D. **ADDITIONAL EXCLUSIONS, CONDITIONS, AND DEFINITIONS:**

1. **Additional Exclusions:** The Fund will not pay for loss as specified below:

a. Acts of Employees, Directors, Trustees, or Representatives: Loss resulting from any dishonest or criminal act committed by any of the **Member's employees**, directors, trustees, or authorized representatives:

(1) Acting alone or in collusion with other persons; or

(2) While performing services for the **Member** or otherwise.

b. **Inventory Shortages**: Loss, or that part of any loss, the proof of which as to its existence or amount is dependent upon:

VOL 0 0 I PAGE 0 I 0 8

(1) An inventory computation; or

(2) A profit and loss computation.

2. **Additional Conditions**

a. Duties in the Event of Loss: If the **Member** has reason to believe that any loss of, or loss from damage to, covered property involves a violation of law, the **Member** must notify the police.

b. Special Limit of Insurance for Specified Property: The **Fund** will pay only up to $5,000 for any one **occurrence** of loss of, and loss from damage to, manuscripts, drawings, or records of any kind or the cost of reconstructing them or reproducing any information contained in them.

3. **Additional Definitions**

a. **Banking Premises** means the interior of that portion of any building occupied by a banking institution or similar safe depository.

b. **Computer Fraud** means theft of property following and directly related to the use of any computer to fraudulently cause a transfer of the property from inside the **premises** or **banking premises** to a person (other than a **messenger**) outside those **premises** or to a place outside those **premises.**

c. **Messenger** means the **Member,** the **Member's** officials, or any **employee** while having care and custody of the property outside the premises.

d. **Occurrence** means an:

(1) Act or series of related acts involving one or more persons; or

(2) Act or event, or a series of related acts or events not involving any person.

e. **Premises** means the interior of that portion of any building the **Member** occupies in conducting the **Member's** business.

f. **Theft** means any act of stealing.

# ANIMAL MORTALITY/THEFT AND MEDICAL COVERAGE OPTION

## I. ANIMAL MORTALITY AND THEFT COVERAGE

### A. COVERAGE

With respect to property on which the **Agreement Declarations** specifies "Animal Mortality and Theft Coverage," this **Agreement** is extended to cover the interest of the **Member** in the animal(s) described in the schedule for loss caused by the following:

1. **Mortality,** meaning death which results directly or indirectly from:

   a. Accident;

   b. Illness; or

   c. Disease.

2. Theft, including death resulting from such theft, subject to the following conditions:

   a. The animal has a number that is registered with a recognized registry which is either tattooed on the animal or in a functional microchip inserted under the skin of the animal and such is stated on the application for this coverage.

   b. If a theft occurs, the **Fund's** liability begins:

      (1) 90 days from the date the **Member** notifies the **Fund** of the theft; and

      (2) Provided the animal is not recovered in that time.

   c. The **Member** must not:

      (1) Pay or promise to pay a ransom; or

      (2) Give any third party assurance of its intent to pay.

   d. The **Fund** has the right to the return of any payment made if:

      (1) The animal has been recovered after the theft; and

      (2) The **Fund** has paid a claim prior to the recovery.

   e. Coverage on a pregnant dog does not include any puppies within the dog.

### B. PAYMENT OF LOSS

If a covered loss occurs, the **Fund** will pay to the **Member** the value shown in the schedule for the animal at the time of loss. Unless otherwise stated, all claim payments will be made to the **Member.**

### C. EXCLUSIONS

1. For the purpose of this coverage only, Exclusion 11., under Paragraph B. of Section III of the Special Form Property Coverage, shall not apply with respect to the animal or animals described in the schedule.

2. The **Fund** will not cover any loss resulting directly or indirectly from:

   a. Surgical operations, administration of drugs, medication, or inoculation, unless:

      (1) Required only in an attempt to prevent death or "humane destruction" – defined as the destruction of an animal to prevent excessive continued suffering due to an incurable injury or terminal disease; and

      (2) Performed and certified by a licensed veterinarian;

   b. Mysterious disappearance or escape;

   c. Intentional destruction. However, this Exclusion shall not apply if:

      (1) The **Fund** agrees to the destruction of the animal; or

      (2) The animal suffers an injury or contracts an excessively painful illness. A qualified Veterinary Surgeon must certify that the animal's suffering is:

         (a) Incurable; and

         (b) So excessive that immediate destruction is necessary for humane reasons;

   d. Destruction as a result of governmental order, due to exposure to or contraction of any communicable disease;

   e. Voluntary parting with the title or possession of the animal because of:

      (1) Fraud,

      (2) Trick, or

(3) False pretense;

f. Death of an animal boarded outside the United States and then returned to the United States within the six months preceding its death.

## D. CONDITIONS

1. Insurability Requirement

   Unless otherwise endorsed, the **Fund** will not be liable for any claim on an animal that:

   a. Suffered from an illness and/or injury, prior to the inception of this coverage and not disclosed on the application form while owned by the **Member** and incurred in the 12 months preceding the date the animal becomes covered;

   b. The **Member** is not the sole owner of;

   c. Has been retired from active duty; or

   d. Has reached the age of ten years.

2. Thirty Day Extension

   If coverage is terminated, the coverage provided by the **Fund** will be extended to cover death which occurs:

   a. Within 30 days after the date of termination; and

   b. As a result of an accident, illness, or disease that:

      (1) Occurred during the period coverage was in force; and

      (2) The **Member** reported to the **Fund** before coverage expired.

3. **Member's** Duties

   a. The **Member** shall dispose of the remains of any animal at the **Member's** expense.

   b. In case of injury or illness to an animal, the **Member** must:

      (1) Immediately notify the **Fund**;

      (2) Employ a licensed veterinarian, at the **Member's** expense, to treat the animal; and

      (3) Secure proper care and, if required, allow the animal to be removed for treatment, at the **Member's** expense.

c. If the animal dies or is stolen, the **Member** must:

   (1) Immediately notify the **Fund**, and in the case of theft, also the police, local animal control, and humane society.

   (2) Give to the **Fund**, within 60 days, a copy of:

      (a) The registration certificate;

      (b) The postmortem examination report in the event of death; and

      (c) A signed and sworn proof of loss.

4. Termination of Ownership

   Coverage will cease on any animal in which the **Member** has, temporarily or permanently, given up all or part of its ownership rights;

   a. By sale;

   b. By lease (unless noted in the schedule); or

   c. For any reason.

5. Assignment of Benefits

   The proceeds of this coverage may not be assigned.

## II. LOSS OF USE COVERAGE

### A. COVERAGE

If the **Agreement Declarations** specifies "Loss of Use Coverage," the **Fund** will pay 60% of the value of a covered animal at the time of injury or 60% of the coverage amount specified in the Schedule, whichever is less, if the animal:

1. Is injured by external, accidental, and violent means during the period this additional coverage is in effect;

2. Becomes totally and permanently unfit for its current use as a result of such injury; and

3. Does not require destruction for humane reasons.

### B. CONDITIONS

1. The **Member** must give the **Fund** immediate notice of any accident resulting in an injury which may give rise to a claim.

2. Within 14 days of such accident, the **Member** must provide a full veterinary report by a qualified Veterinary Surgeon, which will include:

a. A description of the injury suffered;

b. The treatment rendered; and

c. The opinion of the Veterinary Surgeon as to the animal's fitness for its current use.

3. The **Fund** reserves the right to appoint a Veterinary Surgeon to examine the animal.

4. If a claim is made and paid, coverage on the animal for which the claim is paid:

a. Will terminate; and

b. No return contribution will be paid.

5. Any disagreement between the **Member's** and the **Fund's** Veterinary Surgeons over the incapacity of the covered animal will be referred to an independent Veterinary Surgeon mutually agreed to by both parties; and who will act as arbitrator. The decision made by the independent Veterinary Surgeon will be binding on both parties.

6. The provisions of this coverage:

a. Apply only to claims for indemnity for loss of use; and

b. Do not extend to or vary covered claims for indemnity against all risks of mortality.

7. It is understood that upon expiration of coverage all liability ceases. However, coverage is extended to loss of use first occurring within 90 days after expiration, resulting from injury which occurs prior to expiration.

All other applicable terms and conditions under Animal Mortality and Theft Coverage also apply to this coverage.

## III. CANINE VETERINARY FEE COVERAGE

### A. COVERAGE

If the **Agreement Declarations** specifies "Canine Veterinary Fee Coverage," the **Fund** will pay reasonable and customary veterinary fees that result from **injury** to a covered animal. Veterinary fees include:

1. **Veterinary Medical Treatment**, including but not limited to: prescription **medication**, diagnostic radiology, surgery, and laboratory tests necessitated by **injury** to a covered animal.

2. **Hospitalization** of a covered animal necessitated by **injury**.

3. Euthanasia of a covered animal by a veterinarian when the **veterinarian** and the **Member** agree that such action is appropriate for humane reasons.

### B. LIMIT AND DEDUCTIBLE

Coverage is subject to the limit and deductible shown on the **Agreement Declarations**.

### C. DEFINITIONS

1. **Injury** means bodily **injury** caused by an accident, sustained by a covered animal, not attributable to illness.

2. **Veterinary Medical Treatments** are services performed by a duly licensed graduate doctor of veterinary medicine.

3. **Hospitalization** means confinement of the covered animal at the **veterinarian's** premises or at a veterinary hospital while receiving necessary treatment for an **injury** covered hereunder.

4. **Veterinarian** means a duly licensed graduate doctor of veterinary medicine.

5. **Medication** means prescription drugs which are available only from a **veterinarian** or licensed pharmacy.

### D. EXCLUSIONS

This coverage does not apply to loss caused by, happening through, or in consequence of:

1. **Injury** existing before the effective date of this coverage;

2. **Injury** resulting from racing or commercial guarding;

3. Malicious, intentional, or willful **injury** by the owner or caretaker of the covered animal;

4. Any veterinary fees except for those services performed by or under the supervision of a duly licensed graduate doctor of veterinary medicine;

5. Autopsy, disposal, or burial of a covered animal; or

6. Any **injury** caused by or attributed to malnutrition, abuse, mistreatment, neglect, or other inhumane actions by the owner or caretaker of the covered animal.

### E. NOTICE OF LOSS

For the purpose of this coverage only, the **Member** must file proof of a claim which is:

1. An accident/injury report telling how the **injury** occurred;

2. A report signed by the treating **veterinarian** describing the **injury** and treatment provided;

3. Copies of all service bills for which a claim is made (must be itemized and dated); and

4. Filed within 60 days after treatment.

All other applicable terms and conditions under Animal Mortality and Theft Coverage also apply to this coverage.

### IV. SURGICAL COVERAGE

#### A. COVERAGE

If the **Agreement Declarations** specifies "Surgical Coverage," the **Fund** agrees to reimburse the **Member** for:

1. Reasonable and customary fees for surgical procedures performed on a covered animal as specified in the schedule; and

2. Reasonable and customary after-care while the animal is kept on the premises where the surgery is performed.

#### B. LIMIT AND DEDUCTIBLE

1. The combined limit of liability for covered surgery and after-care per animal, per 12 month period is the amount shown under limits on the **Agreement Declarations.**

2. After-care is limited to:

   a. 50% of the cost of surgery; and

   b. No more than 15 days from the time of surgery.

3. The deductible shown on the **Agreement Declarations** shall be applied to each separate claim.

#### C. CONDITIONS

For the purpose of this coverage only, the **Member** must file a proof of claim within 60 days after surgery, including:

1. A report signed by the treating **veterinarian** describing the surgery performed and describing the animal's condition; and

2. Copies of all service bills for which the claim is made.

### D. EXCLUSIONS

Coverage does not apply to:

1. Any surgery unless performed by a licensed **veterinarian** in a school of veterinary medicine or surgical clinic;

2. Conditions existing, diagnosed, or treated prior to the effective date of this coverage;

3. Any examination, medical treatment, or medication unless it is given in conjunction with the covered surgical procedure being claimed;

4. Operations not performed under a general anesthesia;

5. Any elective or voluntary surgical procedure;

6. Death benefits; or

7. Postmortem surgical operations.

All other applicable terms and conditions under Animal Mortality and Theft Coverage also apply to this coverage, with the exception of Animal Mortality and Theft Coverage exclusion C.2.



Texas Municipal League Intergovernmental Risk Pool
1821 Rutherford Lane • Austin, TX 78754
P.O. Box 149194 • Austin, TX 78714-9194
(512) 491-2300 • (800) 537-6655
www.tmlirp.org

# PROPERTY DECLARATIONS OF COVERAGE
## 2013-2014 Fund Year



**Member: Alice Housing Authority**
Member ID: 8723

| Coverages Elected: | | |
|---|---|---|
| [X] Real and Personal Property | [X] Crime | |
| [X] Boiler and Machinery | [ ] Animal Mortality | |
| [ ] Mobile Equipment | | |

### *Real and Personal Property* — Effective Date: 10/01/13 — Anniversary Date: 10/01/14

| | | | |
|---|---|---|---|
| Limit: | $17,608,500 | Deductible: | $1,000 |
| Coverage Basis: | Special Form | Flood and Earthquake | |
| Valuation Basis: | Replacement Cost | Deductible: | $25,000 |
| Transit Limit: | $1,000,000 | | |
| Coverage Extensions: | As Scheduled | | |
| Fine Arts: | Not Included | | |
| Flood and Earthquake: | Included | Annual Contribution: | $41,680 |
| | | Pro Rata Due: | $41,680 |

### *Boiler and Machinery* — Effective Date: 10/01/13 — Anniversary Date: 10/01/14

| | | | |
|---|---|---|---|
| Per Accident Limit: | $6,998,816 | Deductible: | $1,000 |
| Valuation Basis: | Replacement Cost | Annual Contribution: | Included |
| | | Pro Rata Due: | Included |

### *Crime*
### *Public Employee Dishonesty* — Effective Date: 10/01/13 — Anniversary Date: 10/01/14

| | | | |
|---|---|---|---|
| Limit: | $75,000 | Deductible: | $1,000 |
| Coverage Basis: | Per Occurrence | Annual Contribution: | $326 |
| | | Pro Rata Due: | $326 |

### *Theft Disappearance and Destruction* — Effective Date: 10/01/13 — Anniversary Date: 10/01/14

| | | | |
|---|---|---|---|
| Limit: | $12,000 | Deductible: | $100 |
| Coverage Basis: | Per Occurrence | Annual Contribution: | $100 |
| | | Pro Rata Due: | $100 |

| **Total All Elected Property Coverages:** | Annual Contribution: | $42,106 |
|---|---|---|
| | Pro Rata Due: | $42,106 |

PO Box 149194 ◆ Austin, Texas 78714-9194
(512) 491-2300 ◆ (800) 537-6655

# PROPERTY DECLARATIONS OF COVERAGE
## 2013-2014 Fund Year



**Member: Alice Housing Authority**

Member ID: 8723

Coverage is continuous until cancelled. Annual contributions are subject to adjustment each year on the anniversary date based on updated exposure information and changes in rating.

PO Box 149194 ◆ Austin, Texas 78714-9194
(512) 491-2300 ◆ (800) 537-6655

CP8723-2013-1
10/20/2014 11:05:45 AM

P301
Rev. 04/25/11

117

## Schedule of Applicable Documents



| ID | Document Name | Revision Date |
|-------|--------------------------------------------------------|--------------|
| P300 | Property Coverage Document | 10/01/09 |
| P301 | Property Declarations of Coverage | 04/25/11 |
| X150 | Schedule of Applicable Documents | 06/01/08 |
| P200 | Real and Personal Property Schedule | 04/26/10 |
| P215 | Coverage Extensions Schedule | 07/14/08 |
| EP311 | Three Year Rate Endorsement - Real & Personal Property | 05/20/02 |
| EP323 | Faithful Performance of Duty | 05/20/02 |
| EP371 | Transfer of Interest | 11/11/11 |

## Real and Personal Property Schedule

**Member:** Alice Housing Authority
**Member ID:** 8723
**Coverage Period:** 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



Your Real & Personal Property Coverage and associated contribution and limit are based on the values shown on the following schedule. Where a "0" or no value is shown, no coverage is provided. The values shown are the estimated Replacement Cost or Actual Cash Value (RC or ACV) unless otherwise noted and endorsed. Any changes or corrections may require adjustment to the contribution. Improvements and betterments to locations you lease from others are included with the contents value. Your elected Coverage Extension limits are shown on a separate schedule.

| ID | Address or Site Secondary ID | Year Built | Occupancy Department | Building Value Valuation Basis | Contents Value Valuation Basis |
|---|---|---|---|---|---|
| 1 | 1138 Rose Ann | 1981 | Dwelling | 120,300 | 0 |
| | | | Housing Authority | RC | |
| 2 | 1020 N Reynolds | 1981 | Dwelling | 79,800 | 0 |
| | | | Housing Authority | RC | |
| 3 | 413 Escobar | 1981 | Dwelling | 71,000 | 0 |
| | | | Housing Authority | RC | |
| 4 | 728 Glendale | 1981 | Dwelling w/Garage | 96,800 | 0 |
| | | | Housing Authority | RC | |
| 5 | 911 W 3rd St | 1981 | Dwelling | 112,800 | 0 |
| | | | Housing Authority | RC | |
| 10 | 1825 Tony St | 1997 | Dwelling | 89,600 | 0 |
| | | | Housing Authority | RC | |
| 11 | 1824 Tony St | 1997 | Dwelling | 89,600 | 0 |
| | | | Housing Authority | RC | |
| 12 | 1816 Tony St | 1997 | Dwelling | 89,600 | 0 |
| | | | Housing Authority | RC | |
| 13 | 1708 Tony St | 1997 | Dwelling | 89,600 | 0 |
| | | | Housing Authority | RC | |
| 14 | 609 Violeta St | 1997 | Dwelling | 91,300 | 0 |
| | | | Housing Authority | RC | |
| 15 | 607 Violeta St | 1997 | Dwelling | 96,500 | 0 |
| | | | Housing Authority | RC | |
| 16 | 605 Violeta St | 1997 | Dwelling | 109,600 | 0 |
| | | | Housing Authority | RC | |
| 17 | 603 Violeta St | 1997 | Dwelling | 96,500 | 0 |
| | | | Housing Authority | RC | |
| 18 | 601 Violeta St | 1997 | Dwelling | 91,300 | 0 |
| | | | Housing Authority | RC | |
| 19 | 675 Adams St | 1997 | Dwelling | 98,100 | 0 |
| | | | Housing Authority | RC | |
| 20 | 505 E Hill Ave | 1997 | Dwelling | 98,100 | 0 |
| | | | Housing Authority | RC | |
| 21 | 507 E Hill Ave | 1997 | Dwelling | 98,100 | 0 |
| | | | Housing Authority | RC | |

P200

CP8723-2013-1
10/20/2014

Rev. 04/26/10
Page 1 of 7

VOL 001 PAGE 0118

# Real and Personal Property Schedule

**Member:** Alice Housing Authority
**Member ID:** 8723
**Coverage Period:** 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



| ID | Address or Site / Secondary ID | Year Built | Occupancy / Department | Building Value Valuation Basis | Contents Value Valuation Basis |
|----|---------------------------------|-----------|------------------------|-------------------------------|-------------------------------|
| 23 | 125 Olmito St | 1965 | Office | 543,500 | 80,000 |
|    | TX59P178001 | | Housing Authority | RC | RC |
| 24 | 187-188 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 25 | 209-210 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 26 | 155-156 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 27 | 157-158 Seabreeze St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 28 | 171-172 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 29 | 173-174 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 30 | 105-106 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 31 | 107-108 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 32 | 115-116 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 33 | 117-118 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 34 | 121-122 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 35 | 125-126 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 36 | 133-134 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 37 | 145-146 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 38 | 149-150 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 39 | 151-152 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 40 | 207-208 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |
| 41 | 193-194 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|    | TX59P178001 | | Housing Authority | RC | |

VOL 0 0 1 PAGE 0 1 1 9

120

**Member:** Alice Housing Authority
**Member ID:** 8723
**Coverage Period:** 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



| iD | Address or Site / Secondary ID | Year Built | Occupancy / Department | Building Value / Valuation Basis | Contents Value / Valuation Basis |
|---|---|---|---|---|---|
| 42 | 195-196 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 43 | 179-180 Olmito St | 1968 | Duplex 2BR | 94,900 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 44 | 181-182 Olmito St | 1968 | Duplex 1BR | 92,700 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 45 | 183-184 Olmito St | 1968 | Duplex 1BR | 92,700 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 46 | 189-190 Olmito St | 1968 | Duplex 3BR | 127,600 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 47 | 191-192 Olmito St | 1968 | Duplex 3BR | 127,600 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 48 | 143-144 Olmito St | 1968 | Duplex 3BR | 127,600 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 49 | 185-186 Olmito St | 1968 | Duplex 3BR | 127,600 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 50 | 101-104 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 51 | 111-114 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 52 | 129-132 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 53 | 137-140 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 54 | 159-162 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 55 | 199-202 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 56 | 175-178 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 57 | 165-168 Olmito St | 1968 | 4Plex 3BR | 244,000 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 58 | 109-110 Olmito St | 1968 | Duplex 4BR | 146,500 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 59 | 119-120 Olmito St | 1968 | Duplex 4BR | 146,500 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |
| 60 | 203-204 Olmito St | 1968 | Duplex 4BR | 146,500 | 0 |
|  | TX59P178001 |  | Housing Authority | RC |  |

CP8723-2013-1
10/20/2014

P200
Rev. 04/26/10
Page   3 of  7

VOL 0 0 1 PAGE 0 1 2 0

## Real and Personal Property Schedule



| ID | Address or Site<br>Secondary ID | Year<br>Built | Occupancy<br>Department | Building Value<br>Valuation Basis | Contents Value<br>Valuation Basis |
|---|---|---|---|---|---|
| 61 | 169-170 Olmito St | 1968 | Duplex 4BR | 146,500 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 62 | 205-206 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 63 | 123-124 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 64 | 127-128 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 65 | 135-136 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 66 | 141-142 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 67 | 147-148 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 68 | 154-155 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 69 | 197-198 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 70 | 163-164 Olmito St | 1968 | Duplex 3BR | 137,300 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 71 | Mesquite St | 1968 | Apartment Bldg-5Story | 4,885,700 | 0 |
|    | TX59P178001 |      | Housing Authority | RC |  |
| 72 | 1212-1214 Arlington St | 1978 | Duplex 2BR | 105,200 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 73 | 1208-1210 Arlington St | 1978 | Duplex 2BR | 105,200 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 74 | 1204-1206 Arlington St | 1978 | Duplex 2BR | 105,200 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 75 | 1200-1202 Arlington St | 1978 | Duplex 2BR | 105,200 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 76 | 110-112 Woodlawn Ave | 1968 | Duplex 2BR | 105,200 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 77 | 1000 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 78 | 1002 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |
| 79 | 1004 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
|    | TX59P178002 |      | Housing Authority | RC |  |

VOL 0 0 1 PAGE 0 1 2 1

122

## Real and Personal Property Schedule

**Member:** Alice Housing Authority
**Member ID:** 8723
**Coverage Period:** 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



| ID | Address or Site Secondary ID | Year Built | Occupancy Department | Building Value Valuation Basis | Contents Value Valuation Basis |
|---|---|---|---|---|---|
| 80 | 1006 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 81 | 1008 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 82 | 1010 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 83 | 1012 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 84 | 1014 Pierce Dr | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 85 | 1016 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 86 | 1018 Pierce St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 87 | 1001 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 88 | 1003 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 89 | 1005 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 90 | 1007 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 91 | 1009 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 92 | 1011 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 93 | 1013 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 94 | 1015 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 95 | 1017 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 96 | 1019 Grace St | 1978 | Dwelling 3BR | 62,100 | 0 |
| | TX59P178002 | | Housing Authority | RC | |
| 97 | 509-519 E 3rd St | 1985 | 6Plex | 284,000 | 0 |
| | TX59178004 | | Housing Authority | RC | |
| 98 | 501-507 E 3rd St | 1985 | 4Plex | 158,800 | 0 |
| | TX59178004 | | Housing Authority | RC | |

VOL 0 0 1 PAGE 0 1 2 2

## Real and Personal Property Schedule

**Member:** Alice Housing Authority
**Member ID:** 8723
**Coverage Period:** 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



| ID | Address or Site / Secondary ID | Year Built | Occupancy / Department | Building Value / Valuation Basis | Contents Value / Valuation Basis |
|---|---|---|---|---|---|
| 99 | 525-531 E 3rd St | 1985 | 4Plex | 158,800 | 0 |
| | TX59178004 | | Housing Authority | RC | |
| 100 | 521-523 E 3rd St | 1985 | Duplex | 100,700 | 0 |
| | TX59178004 | | Housing Authority | RC | |
| 101 | 1705 Tony St | 1985 | Dwelling 3BR | 67,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 102 | 1713 Tony St | 1985 | Dwelling 3BR | 67,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 103 | 1725 Tony St | 1985 | Dwelling 3BR | 67,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 104 | 1805 Tony St | 1985 | Dwelling 3BR | 67,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 105 | 1813 Tony St | 1985 | Dwelling 3BR | 67,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 106 | 1701 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 107 | 1709 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 108 | 1717 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 109 | 1721 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 110 | 1801 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 111 | 1809 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 112 | 1817 Tony St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 114 | 1821 Tony St | 1985 | Dwelling 2BR | 63,300 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 115 | 1302 W 2nd St | 1985 | Dwelling 2BR | 63,300 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 116 | 1306 W 2nd St | 1985 | Dwelling 2BR | 63,300 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 117 | 1309 W 2nd St | 1985 | Dwelling 2BR | 63,300 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 118 | 1300 W 2nd St | 1985 | Dwelling 3BR | 75,600 | 0 |
| | TX598023001 | | Housing Authority | RC | |

CP8723-2013-1
10/20/2014

P200
Rev. 04/26/10
Page    6 of  7

VOL 001 PAGE 0123

## Real and Personal Property Schedule

**Member:** Alice Housing Authority
**Member ID:** 8723
**Coverage Period:** 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



| ID | Address or Site<br>Secondary ID | Year<br>Built | Occupancy<br>Department | Building Value<br>Valuation Basis | Contents Value<br>Valuation Basis |
|---|---|---|---|---|---|
| 119 | 1304 W 2nd St | 1985 | Dwelling 3BR | 75,600 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 120 | 1308 W 2nd St | 1985 | Dwelling 3BR | 75,600 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 121 | 1311 W 2nd St | 1985 | Dwelling 3BR | 75,600 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 122 | 1310 W 2nd St | 1985 | Dwelling 2BR | 64,900 | 0 |
| | TX598023001 | | Housing Authority | RC | |
| 123 | 125 Olmito St | 0 | Playground | 18,000 | 0 |
| | | | Housing Authority | RC | |
| 124 | 125 Olmito St | 0 | Playground | 15,000 | 0 |
| | | | Housing Authority | RC | |
| 125 | 125 Olmito St | 0 | Playground | 20,000 | 0 |
| | | | Housing Authority | RC | |
| 126 | 1019 Grace St | 0 | Playground | 12,000 | 0 |
| | | | Housing Authority | RC | |
| 127 | 1214 Arlington St | 2002 | Pavilion | 5,500 | 0 |
| | | | Housing Authority | RC | |
| 128 | 1216 Arlington St | 1983 | Warehouse | 80,000 | 50,000 |
| | | | Housing Authority | RC | RC |
| 129 | 125 Olmito St | 1993 | Equipment Shed | 1,200 | 8,000 |
| | | | Housing Authority | RC | RC |
| 130 | East 3rd St | 1985 | Laundry Building | 18,900 | 0 |
| | | | Housing Authority | RC | |
| **Coverage: Real & Personal Property** | | **Total Items:** | 124 | 17,470,500 | 138,000 |

VOL 001 PAGE 0124

## Coverage Extensions Schedule

Member:  Alice Housing Authority
Member ID: 8723
Coverage Period: 10/01/2013 to 10/01/2014 Shown As of 05/27/2014



Elected Coverage Extension limits are shown below.  Any changes or corrections may require adjustment to the contribution. Note: Limits for Newly Acquired Property and Pollutant Cleanup and Removal may not be increased above the limits indicated below.

| Coverage Extension | Limit |
|---|---|
| Valuable Papers and Records & EDP Media | $10,000 |
| Accounts Receivable | $10,000 |
| Loss of Revenue, Extra Expense and Rental Value | $200,000 |
| Personal Property of Employees and Officials | $5,000 |
| Leasehold Interest | $5,000 |
| Outdoor Trees and Shrubs ($250 per item) | $10,000 |
| Newly Acquired Property | $1 Million or the Real & Personal Property Limit, whichever is less |
| Pollutant Cleanup and Removal | $20,000 each premises |

CP8723-2013-1
10/20/2014

P215
Rev. 07/14/08
Page  1 of 1

VOL 0 0 1 PAGE 0 1 2 5

# TAB "C"



FILED AT _9:30_ O'CLOCK ___ M
R. DAVID GUERRERO

JAN 15 2015

CLERK, DIST COURT, JIM WELLS CO, TEXAS
BY/

CAUSE NO. 14-10-53721-CV

| | |
|---|---|
| HOUSING AUTHORITY OF THE CITY OF ALICE | § IN THE DISTRICT COURT |
| | § |
| Plaintiff | § |
| | § |
| v. | § |
| | § |
| TEXAS MUNICIPAL LEAGUE JOINT SELF-INSURANCE FUND, *et al.* | § OF JIM WELLS COUNTY, TEXAS |
| | § |
| Defendant | § 79th JUDICIAL DISTRICT |

### Order Selecting Umpire

The Housing Authority of the City of Alice has filed an Application for the Appointment of an Umpire and the Court considered the responses in opposition to the selection of an umpire and the evidence admited at the hearing on the plea to the jurisdiction, the plea in abatement and the appliaciton for the appoitnment of an umpire and the oral argument on the matter, and the Court is of the opinion that the Court should select an umpire as provided by the agreement of the parties in the Property Coverage Document issued by the Fund to the Housing Authority, and therefore _Terry Shamsie_ is selected as umpire.

The Plea to the Jurisdiction and the Plea in Abatement (of the Texas Municipal Leage Joint Self Insurance Fund and the Texas Municipal League Intergovernmental Risk Pool) are both overruled. This judgment finally disposes of all parties and all claims and is appealable.

Signed this _15_ day of January 2015.

_____
Judge Presiding

POSTED
284

# TAB "D"

## TEX. LOC. GOV'T CODE §271.152.  Waiver of Immunity to Suit for Certain Claims

A local governmental entity that is authorized by statue or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

## TEX. LOC. GOV'T CODE §271.153.  Limitations on Adjudication Awards

(a)  Except as provided by Subsection (c), the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to the following:

   (1)  the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;

   (2)  the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;

   (3)  reasonable and necessary attorney's fees that are equitable and just; and

   (4)  interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

(b)  Damages awarded in an adjudication brought against a local governmental entity arising under a contract subject to this subchapter may not include:

   (1)  consequential damages, except as expressly allowed under Subsection (a)(1);

   (2)  exemplary damages; or

   (3)  damages for unabsorbed home office overhead.

(c)  Actual damages, specific performance, or injunctive relief may be granted in an adjudication brought against a local governmental entity for breach of a contract described by Section 271.151(2)(B) [which deals with contract for sale/delivery of reclaimed water].

## TEX. LOC. GOV'T CODE §271.154. Contractual Adjudication Procedures Enforceable

Adjudication procedures, including requirements for serving notices or engaging in alternative dispute resolution proceedings before bringing a suit or an arbitration proceeding, that are stated in the contract subject to this subchapter or that are established by the local governmental entity and expressly incorporated into the contract or incorporated by reference are enforceable except to the extent those procedures conflict with the terms of this subchapter.

# TAB "E"

### TEX. GOV'T CODE §791.001.  Purpose

The purpose of this chapter is to increase the efficienty and effectiveness of local governments by authorizing them to contract, to the greatest possible extent, with one another and with agencies of the state.

### TEX. GOV'T CODE §791.011(a).  Contracting Authority; Terms

(a)  A local government may contract or agree with another local government or a federally recognized Indian tribe, as listed by the United States secretary of the interior under *25 U.S.C. Section 479a-1*, whose reservation is located within the boundaries of this state to perform governmental functions and services in accordance with this chapter...

### TEX. GOV'T CODE §311.034.  Waiver of Sovereign Immunity

In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language.  In a statue, the use of "person," as defined by Section 311.005 to include governmental entities, does not indicate legislative intent to waive sovereign immunity unless the context of the statute indicates no other reasonable construction.  Statutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity.